Joy Danielle DOSS *v.* STATE of Arkansas

CR 02-599                                                97 S.W.3d 413

Supreme Court of Arkansas
Opinion delivered February 6, 2003

*James Law Firm*, by: *William O. James, Jr.* and *Clay T. Buchanan*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Clayton K. Hodges* and *KaTina Hodge*, Law student admitted to practice pursuant to Rule XV(E)(1)(b) of the Rules Governing Admission to the Bar under supervision of *Darnisa Evans Johnson*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Joy Doss appeals from her capital-murder conviction and her sentence of life in prison without the possibility of parole. Her sole point on appeal is that there was insufficient evidence to convict her. We hold that the issue is not preserved for our review, and we affirm the judgment of conviction and sentence.

In the early morning hours of December 6, 2000, Doss, together with her roommate, James Pugh, murdered their third roommate, Keith Van Maren.[1] Doss was twenty-one years of age and weighed approximately 300 pounds. Following her arrest, Doss provided both a written statement and oral statement to law enforcement, which was transcribed. Her statements, which were admitted into evidence at trial over her objection, detailed the events of the murder. Doss also described the events that transpired that evening when she took the stand in her own defense. The following description of events is taken from those statements and her testimony.

On the evening of December 5, 2000, Doss visited with Sheila Uptegrove, a mutual friend of Doss, Pugh, and Van Maren, in the apartment that she shared with Pugh and Van Maren. The four individuals had had an ongoing friendship and, according to Doss, had engaged in bondage activity and other sexual "games."

---

[1] This court affirmed James Pugh's judgment of conviction as an accomplice to capital murder and his sentence in *Pugh v. State*, 351 Ark. 5, 89 S.W.3d 909 (2002).

Doss testified that they sometimes would engage in holding each other down and forcing sex upon one another. They would also cut each other with knives and drink each other's blood. Doss further described "wrestling matches" in which "there would be a lot of knives involved, strangling . . . a lot of mock strangling especially with the bondage[.]" Additionally, Doss testified that Uptegrove, on prior occasions, had discussed killing Van Maren with Pugh and her. Doss stated that she did not take these discussions seriously.

The evening of December 5, at about 10:45 p.m., Pugh took Uptegrove home, and Doss went into Van Maren's bedroom to use his computer. Van Maren lay on the couch in another room and watched television. Sometime later, Doss turned the computer off and went in to wake up Van Maren. When she did so, Van Maren was abusive, both physically and mentally, to her. After that occurred, the telephone rang, and Doss answered it while Van Maren went to bed. Uptegrove was on the phone, and Doss told her that when she woke Van Maren, he and she "got into a little bit of an argument and he pushed [her] around a little bit[.]" Doss then told Uptegrove that if Uptegrove was going to kill Van Maren, as she had previously talked about, "tonight would have to be the night." At that point the conversation turned to a discussion of one plan Uptegrove had to kill Van Maren, which was to strangle him in his sleep and pretend he was laundry by placing him in a green duffel bag. The telephone conversation ended, and Doss stayed up watching television.

At approximately 1:30 a.m., Pugh returned to the apartment and said he was going to bed. He asked Doss to wake him in about an hour and a half which she did. When she woke Pugh, he informed her that they were going to kill Van Maren. She testified that she did not take Pugh seriously and believed that this was going to be another one of the mock strangulations in which the group had previously engaged. Doss stated that she grew concerned when Pugh handed her a pillow and told her that she should hold the pillow over Van Maren's face, not to suffocate him, but to "muffle the noise." At that point, Doss said she protested, but Pugh responded: "[Y]ou know what I'm capable of . . . ." At trial, she testified that Pugh added that "if you don't

want to be next, you'll go along." Doss testified that she continued to believe that this would be one of their mock murders.

Pugh next directed Doss to pop the lock on Van Maren's bedroom door which she did. Upon entering the room, Pugh told Doss: "I'm going to strangle him and then you put the pillow over his face[.]" After Pugh forced Van Maren's hands underneath his legs, Doss put the pillow over Van Maren's face, and Pugh began to strangle him. Van Maren struggled and moaned. Pugh told Doss to get a belt which she did. Upon her return, both Pugh and Doss sat on top of Van Maren, and Pugh proceeded to strangle Van Maren with the belt, while Doss also straddled him and held him down. Doss testified that until that point, she had not realized that Pugh was serious.

While Pugh was strangling Van Maren, Doss left the room to get a knife to give to Van Maren for self-defense. According to Doss, Pugh wrestled the knife away from Van Maren. She then attempted to pull Pugh off of Van Maren without success. At some point, Doss testified, she did hold onto one end of the belt around Van Maren's neck, but she said she did not pull on it; only Pugh did. Later, Doss checked Van Maren's pulse and found none. Uptegrove called again at 3:09 a.m., and Doss confirmed that Pugh was finishing Uptegrove's "laundry" but that he was having complications. Next, Doss found a duffel bag, at Pugh's request, in which Pugh tried to put Van Maren's body. Uptegrove later called the Fayetteville Police Department to alert law enforcement that Van Maren's life might be in danger.

Police officers arrived at the apartment, saw that Van Maren was dead, and requested that Doss and Pugh accompany them to the police station for questioning. They agreed. Detective Timothy Franklin arrived at the police station shortly after 4:45 a.m. and observed Doss lying on the floor of the interrogation room. When he entered the room, she stood up, and Detective Franklin noticed a blood stain on her pants. She consented to turning the pants over to Detective Franklin for analysis, and it was later determined that Doss's own blood was on her pants.

Detective Franklin next filled out an information form and read Doss her *Miranda* rights. After reading the form, Doss ini-

tialed each response and signed the form at the bottom. Detective Franklin proceeded to ask her about the events of the evening, to which Doss basically denied any involvement. Detective Franklin left Doss and gathered information about Pugh's separate interrogation. Doss contended that at this point she requested a lawyer several times, but the detective disputed this claim. Detective Franklin returned to Doss's room and informed her that Pugh had implicated her. Doss, however, continued to deny that she had been involved in the murder.

The detective then placed Doss under arrest. After handcuffing her and while transporting her to the jail, Doss asked Detective Franklin whether she would get the opportunity to speak with him again. She also asked him how she could get a lawyer. Detective Franklin responded to each question and told her that he was not interested in talking to her anymore if she was just going to continue lying to him. He also told her that she could either call a lawyer or one would be appointed for her on her court date. At her suppression hearing, Doss testified that Detective Franklin "took hold of [her] handcuffs and pushed [her] — kind of pulled [her] down the stairs."

At about 8:10 a.m., Detective Franklin received a call from the matron at the jail informing him that Doss wanted to speak with him. A few minutes later, the jailer called again and told the detective that Doss wanted a pencil and paper to write him a letter. Detective Franklin approved the request. At around 10:00 a.m., the detective went to the jail and took Doss to the detective division for further interrogation. Doss handed him part of a letter which she had drafted about the killing, which Franklin read while Doss completed it. He then *mirandized* her a second time and proceeded to tape record another interview with Doss. This statement was later transcribed and entered into evidence at trial. At the end of the interview, she stated that she wanted an attorney, at which time Franklin stopped the interview.

Prior to the ensuing jury trial, Doss moved to suppress her statements on the basis that they were obtained without legal counsel and by psychological ploys and promises by police officers which resulted in overcoming Doss's will. A lengthy suppression

hearing was held before the circuit court, and the motion was denied. At trial, Doss' statements were admitted into evidence, and testimony was taken. Each police officer involved in the investigation as well as the criminal investigators from the state crime lab testified. Additionally, the State presented testimony from Stacey Cooper, who had been in a jail cell with Doss following her arrest. Cooper testified that Doss had told her and a third cellmate that she had killed her roommate by smothering him with a pillow and later had strangled him with a belt. She also testified that Doss's only regret was that Uptegrove had called the police before she did and implicated her. The medical examiner testified that Van Maren died of asphyxia due to a combination of strangulation and suffocation. Doss presented a defense of duress due to Pugh's threats and a general lack of scientific evidence connecting her to the crime. She took the stand in her own defense. Doss was convicted of being an accomplice to capital murder and was sentenced to life imprisonment without parole.

On appeal, Doss argues that the State failed to provide sufficient evidence to prove her guilt as an accomplice to capital murder. We conclude, nevertheless, that we are precluded from reviewing her allegation of error. Following the State's evidence at trial, Doss's attorney made a motion for directed verdict which was denied by the circuit court. That motion was renewed at the conclusion of Doss's case and was again denied. The State then offered a rebuttal witness. No renewal of the motion for directed verdict was made by defense counsel following the State's rebuttal testimony.

■ ■ Arkansas Rule of Criminal Procedure 33.1(a) provides that in a jury trial, "if a motion for directed verdict is to be made, it shall be made at the close of the evidence offered by the prosecution and at the close of all the evidence." Ark. R. Crim. P. 33.1(a). The rule further provides that a failure to renew the motion constitutes a waiver of the question of sufficiency:

> (c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment. . . . A renewal at the close of all of the evidence of a

> previous motion for directed verdict or for dismissal preserves the issue of insufficient evidence for appeal.

Ark. R. Crim. P. 33.1(c). Indeed, where an appellant failed to renew his motion for directed verdict at the close of the State's rebuttal, which was "the close of all the evidence," we have said in several cases that we were precluded from appellate review of the sufficiency argument. *Grady v. State*, 350 Ark. 160, 167, 85 S.W.3d at 531, 534 (2002). *See also Smith v. State*, 347 Ark. 277, 61 S.W.3d 168 (2001); *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999); *Rankin v. State*, 329 Ark. 379, 948 S.W.2d 397 (1997); *Christian v. State*, 318 Ark. 813, 889 S.W.2d 717 (1994).

■ Accordingly, because appellant failed to renew her motion for directed verdict following the State's rebuttal, we cannot consider her sufficiency argument on appeal.

### 4-3(h) Review

■ In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no error has been found. We note as part of our review that Doss contended before the circuit court that her statement to Detective Franklin was taken in violation of her right to counsel. She does not raise this issue on appeal. It is clear to this court, however, that Doss was *mirandized* before each interrogation by Detective Franklin and that he ceased questioning her when counsel was requested. It further appears clear that Doss initiated contact with Detective Franklin which led to the second interview. *See e.g., Lacy v. State*, 345 Ark. 63, 44 S.W.3d 296 (2001) (holding that when an accused requests an attorney, a police interrogation must cease until counsel has been made available to him; however, if the accused initiates further communication, exchanges, or conversations with police officers, any resulting statement may be admissible). We conclude that the circuit court correctly refused to suppress her statements.

Affirmed.