Curtis Ray FLOWERS *v.* STATE of Arkansas

CR 04-853                                              208 S.W.3d 113

Supreme Court of Arkansas
Opinion delivered May 5, 2005

[Rehearing denied June 9, 2005.]

David P. Price, for appellant.

Mike Beebe, Att'y Gen., by: Suzanne Antley, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Curtis Ray Flowers appeals the order of the Columbia County Circuit Court convicting him of capital murder and aggravated robbery. As Appellant was sentenced to a term of life imprisonment without parole in the Arkansas Department of Correction, our jurisdiction is pursuant

to Ark. Sup. Ct. R. 1-2(a)(1). On appeal, Appellant argues that: (1) the State improperly exercised its peremptory challenges; (2) the trial court erred in failing to suppress his custodial confession; (3) the trial court erred in excluding the testimony of an expert witness; (4) the jury's verdict was based on speculation because of confusion over the instructions for capital murder and first-degree murder; (5) the trial court erred in refusing to instruct the jury on the lesser-included offense of second-degree murder; and (6) there was insufficient evidence to support the guilty verdict. We find no error and affirm.

Convenience store owner Jerry Dean Anderson Jr. was found murdered in his store, J.D.'s Quickstop, in McNeil, Arkansas, on April 20, 2003. Police investigating the crime soon developed Appellant as a suspect based on information that he had been at a party earlier in the evening, left during the time the robbery and murder occurred, and then returned and mentioned to some people that he was involved. At the request of officers with the Arkansas State Police, who were investigating the crime, Deputy LeRoy Martin, with the Columbia County Sheriff's Office, went to the home of Appellant's mother on the evening of April 23, 2003, and asked Appellant if he would come with him because some officers wanted to talk to him about the Anderson murder. Appellant willingly went with Martin to the sheriff's office. There, he was interviewed by Special Agent John Bishop and Sergeant Jerry Digman of the Arkansas State Police. Appellant initially denied any involvement in the crime, but eventually confessed.

Appellant was subsequently arrested and charged by felony information with one count of capital murder and one count of aggravated robbery. Prior to trial, Appellant sought to suppress the custodial confession he gave officers implicating himself in the crime. The trial court held a hearing on the motion to suppress on March 1, 2004. Both Bishop and Digman testified that Appellant was advised of his *Miranda* rights, that he understood those rights, and he signed the *Miranda* waiver form prior to giving his statement. They also denied threatening Appellant in any way.

Appellant testified that the officers did not read him his rights, refused to allow him to contact his lawyer as he requested, and threatened to kill his daughter and arrest his mother if he did not confess to the murder and robbery. Also testifying on behalf of Appellant was Dr. Tom Wright, a psychologist, who opined that based on Appellant's IQ range of 57 − 62, it was not possible for

Appellant to knowingly, intelligently, and voluntarily make a waiver of his *Miranda* rights. At the conclusion of the hearing, the trial court stated that it found the testimony of the investigating officers to be more credible than that of Appellant, thereby denying the motion to suppress.

Another pretrial hearing was held on March 22, 2004. One of the motions considered by the trial court was a motion *in limine* filed by the State to prevent Appellant from presenting during trial the testimony of Dr. Wright that Appellant's confession was not voluntarily given. The State argued that such testimony would invade the province of the jury to determine the credibility of witnesses. The trial court took the matter under advisement, but later granted the State's motion.

Appellant was tried before a Columbia County jury on March 23–31, 2004. Chester Anderson, uncle of the victim, testified that he was working in the store part of the day on April 20. He explained that his nephew had left for a while to go see his newborn grandchild, but returned that evening at approximately 7:30 p.m. Shortly thereafter, Chester left for the evening, but he talked to his nephew again around 8:50 p.m. about an upcoming shift change. Then, at approximately 9:15 p.m., Chester received a call from Pete Polk, an area business owner, that he had gone by the store and found J.D., who had been shot and was lying in a pool of blood. After police removed J.D.'s body from the store, they escorted Chester into the store to ascertain what exactly was missing. Chester testified that the cash from the cash register was missing, except for a few twenties that were under some checks. He also stated that a cigar box containing loose change that was kept under the counter was missing.

Rebecca Berry testified that she was taking her daughter's friend home at approximately 9:00 p.m. on April 20, and when she drove by J.D.'s store, she noticed J.D.'s truck was still at the store. Berry thought it was unusual for him to be at the store at such a late hour. When Berry stopped at an intersection near the store, she noticed a person running and looking back toward the store. She described the person as black, approximately five feet, ten inches tall and weighing approximately 140 pounds. Berry was unsure, however, if the person was a male or a female. She then noticed a car turn into an alleyway between two homes across from J.D.'s. Berry decided to stop at J.D.'s. She knocked on the store's door

and after getting no response, opened the door, stepped inside, and immediately saw some blood. Berry ran to one of the homes across the street and asked someone to call 911, because she believed J.D. had been robbed. Berry returned to J.D.'s, went back inside, and saw J.D. lying behind the counter. She then flagged down Pete Polk, who was driving on Front Street, and told him about finding J.D. and asked him to dial 911.

Robert McCallie testified that he and his wife left his grandmother's house at approximately 9:00 p.m. on April 20, and while on their way home noticed lights on at J.D.'s store. They drove by and someone told them that J.D. had been shot. After leaving, McCallie and his wife noticed a bandanna laying in the road near an alleyway. McCallie sent his wife back to J.D.'s to tell the police about what they had found. McCallie's wife returned with Officer Jerry Reich of the Columbia County Sheriff's Department, who collected the bandanna and placed it into an evidence bag.

Lieutenant Truman Young of the Columbia County Sheriff's Office testified that he was the lead investigator in the murder investigation. Young testified about the crime scene as he found it on the evening of April 20. He indicated that the cash register drawer was open and that the money holders were lifted upward. Young also stated that the next morning, Deputy Martin contacted him and asked him to come to McNeil. When he arrived in McNeil, Young was told that someone had discovered part of a wallet belonging to J.D., underneath a viaduct on U.S. Highway 79, approximately one-half mile from J.D.'s store. Young later found a Southwestern Bell calling card and a Sears card with J.D.'s name on them in the same area.

Stephen Erickson, medical examiner with the Arkansas State Crime Lab, testified that he performed an autopsy on J.D. and determined that he died as a result of three gunshot wounds. The first wound was a near-contact wound over the left, front temple. The second gunshot wound was to the left side of the neck, and a third wound was just above the elbow on the left arm.

Chantelle Bequette-Taylor, a criminalist with the State Crime Lab, testified that she performed trace-analysis tests on the bandanna recovered near J.D.'s store and discovered a single hair of "Negroid" origin. She compared the hair to some samples received in the case and sent it for DNA testing. According to

Bequette-Taylor, the hair recovered from the bandanna was microscopically similar to the hair of Appellant.[1]

Special Agent Bishop testified about his involvement in the investigation of the Anderson murder. He explained that several persons provided statements that Appellant was involved in the murder. One of those persons was Natasha Jones, Appellant's girlfriend.[2] After initially denying any knowledge regarding Anderson's murder, Jones told Bishop that she had been with Appellant at a party in Cotton Belt when she noticed that he was gone. According to Jones, when Appellant returned, he told her that he had been to McNeil, met up with Craig Curry and his wife, and that he and Curry robbed J.D.'s, taking some cigarettes, a cigar box containing loose change, and J.D.'s wallet. He also told Jones that Curry shot J.D. and that they had thrown J.D.'s wallet out of the car near the viaduct. Jones also told the officers that Curry and Appellant were wearing head scarves over their mouths while robbing the store.

Bishop also read into evidence the statement given by Appellant admitting his involvement in the crimes. In that statement, Appellant claimed that he was in McNeil on April 20, when Curry and his wife flagged him down and asked him to ride around with them. While driving around, Curry stated that he was going to rob J.D.'s Quickstop and asked Appellant to go with him. Curry's wife, who was driving, dropped the two men near the store. Curry put on a mask and the two men entered the store. Curry demanded money and J.D. gave him the cash from the register. According to Appellant, he then left the store and once outside, he heard two gunshots. Curry's wife picked the two men up, and drove the trio to a bridge where Curry threw Mr. Anderson's wallet out the window.

At the close of the State's case, Appellant submitted a written motion for directed verdict, arguing that there was no evidence to prove the underlying felony of aggravated robbery. Appellant also argued that there was no physical evidence linking him to the crime. The State argued that there was sufficient evidence sup-

---

[1] Terry Rolfe, with the State Crime Lab, testified that he performed a DNA test on saliva found on the bandanna, but that the saliva did not match Appellant's DNA. The saliva on the bandanna matched the DNA profile of Kendrick Story, who is not implicated in these crimes.

[2] Jones later recanted her statement implicating Appellant in this murder.

porting its case, primarily Appellant's own statement admitting his involvement in the crime. The trial court denied the motion for directed verdict.

Appellant took the stand on his own behalf. He denied any involvement in the Anderson murder. Appellant testified that during his interview with Bishop and Digman he denied any knowledge regarding the crime, but that he eventually confessed after Bishop threatened to harm his six-year-old daughter and arrest his mother. Appellant claimed that he was frightened of Bishop. Appellant also testified that he was not advised of his *Miranda* rights, but that he asked to speak to his attorney, and Bishop would not let him do so.

Appellant renewed his motion for a directed verdict at the close of his case-in-chief, and again it was denied. Thereafter, the State presented evidence on rebuttal. One of the State's rebuttal witnesses was Jacqueline Curry. She testified that she and her husband, Craig, and their son went to McNeil on April 20 to visit his mother and grandmother. Appellant was with them during part of the day, but Curry stated that she did not see him after they dropped him off at his girlfriend's house at approximately 4:00 or 4:30 p.m. According to Curry, her husband left sometime after dark to go and look for Appellant. Craig returned at approximately 9:00 or 9:30 p.m. They left his mother's house and were subsequently stopped for a traffic violation. Craig was then arrested on an outstanding warrant.

Verta Flowers, Appellant's cousin, also testified that she saw Appellant with his girlfriend on the afternoon of April 20. She also saw him later that evening at a party in Cotton Belt, but then noticed between 8:00 and 9:00 p.m. that Appellant was no longer at the party. She saw him return about an hour later.

Also testifying on behalf of the State was William Keith Brown. Brown testified that he attended the party at Cotton Belt and that when he arrived, Appellant was already there. Brown also stated that when he left the party sometime between 8:30 and 9:00 p.m., he noticed that Appellant was no longer there. Brown went to a nearby convenience store to purchase some cigars and when he returned approximately fifteen minutes later, Appellant was again at the party.

Following the presentation of all the evidence, the case was submitted to the jury. During deliberations, the jury submitted a note to the trial court, which read: "What is the difference

between: Capital Murder, 1st Degree Murder, [and] Felony Murder[?] We can't discern a difference." Thereafter, the trial court reminded the jury of the instructions that had been given and ordered them to continue deliberations. The jury subsequently returned guilty verdicts on the charges of capital murder and aggravated robbery. This appeal followed.

## I. Sufficiency of the Evidence

Appellant argues that there was insufficient evidence to support his conviction for capital murder. Appellant raises this argument as his sixth point on appeal, but an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence prior to a review of any asserted trial errors. *Carter v. State*, 360 Ark. 266, 200 S.W.3d 906 (2005). Appellant avers that the only physical evidence the State had to support its allegation that the underlying felony supporting the capital murder charge was aggravated robbery was a part of the victim's wallet that was found near a highway viaduct. Appellant further argues that there was no evidence to prove that he took the wallet from the victim. Appellant also alleges that the police did not adequately investigate the murder. The State counters that there was ample evidence linking Appellant to the crime.

We do not reach the merits of this point, because Appellant failed to preserve his argument below. This court has repeatedly held that Ark. R. Crim. P. 33.1 requires that a motion for directed verdict be made at the close of the State's case and again at the close of all of the evidence. *See, e.g., Romes v. State*, 356 Ark. 26, 144 S.W.3d 750 (2004); *Doss v. State*, 351 Ark. 667, 97 S.W.3d 413 (2003); *Pyle v. State*, 340 Ark. 53, 8 S.W.3d 491 (2000). This renewal is more than a matter of mere form; it goes to the substance of the evidence arrayed against the criminal defendant. *Cathey v. State*, 351 Ark. 464, 95 S.W.3d 753 (2003); *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998). Accordingly, the failure to challenge the sufficiency of the evidence at both the close of the State's case and the close of all of the evidence will constitute a waiver of any question pertaining to the sufficiency of the evidence on appeal. *See Doss*, 351 Ark. 667, 97 S.W.3d 413; *Cathey*, 351 Ark. 464, 95 S.W.3d 753.

In the instant case, the record reflects that Appellant submitted a written motion for directed verdict, arguing that there was no evidence to support a conclusion that a robbery occurred and that there was also a lack of physical evidence connecting him

to any crime. After considering Appellant's motion and the State's response, the trial court denied the motion. At the conclusion of his case, Appellant renewed his motion for directed verdict, and again it was denied. Thereafter, both the State and Appellant presented rebuttal witnesses. Absent from the record, however, is any indication that Appellant again renewed his motion for directed verdict as required by Rule 33.1 and this court's case law. Accordingly, Appellant failed to preserve his challenge to the sufficiency of the evidence for appellate review.

## II. Batson Violation

Appellant next argues that the prosecution exercised its peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), by striking seven African-American jurors and only one Caucasian juror. According to Appellant, the high percentage of African-Americans struck from the jury raised a presumption of improper racial discrimination in the makeup of the jury. The State counters that there was no *Batson* violation, as the State offered race-neutral explanations for each of the strikes that Appellant challenged on *Batson* grounds. We agree with the State.

Under *Batson*, 476 U.S. 79, a prosecutor in a criminal case may not use his peremptory strikes to exclude jurors solely on the basis of race. *See Ratliff v. State*, 359 Ark. 479, 199 S.W.3d 79 (2004); *Wooten v. State*, 351 Ark. 241, 91 S.W.3d 63 (2002). The United States Supreme Court in *Batson* adopted a three-part test to determine whether a peremptory strike violates the Equal Protection Clause. *Holder v. State*, 354 Ark. 364, 124 S.W.3d 439 (2003); *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998). The first question under the *Batson* test is whether a *prima facie* case of discrimination has been shown. This court in *MacKintrush* held that this first question is resolved by showing the following: (a) the opponent of the strike shows that he is a member of an identifiable racial group; (b) the strike is part of a jury-selection process or pattern designed to discriminate; and (c) the strike was used to exclude jurors because of their race. Once discrimination is evident, the burden of producing a racially neutral explanation then shifts to the proponent of the strike. *Ratliff*, 359 Ark. 479, 199 S.W.3d 79. If a race-neutral explanation is given, the inquiry proceeds to the third step, in which the trial court must decide whether the opponent of the strike has proven purposeful discrimination. *Id.* Here, the strike's opponent must persuade the trial court that the expressed motive of the striking party is not genuine

but, rather, is the product of discriminatory intent. *Hinkston v. State*, 340 Ark. 530, 10 S.W.3d 906 (2000).

This court will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Holder*, 354 Ark. 364, 124 S.W.3d 439. The trial court is accorded some deference in making *Batson* rulings because it is in a superior position to observe the parties and to determine their credibility. *Id.* Moreover, unless discriminatory intent appears in the prosecutor's explanation, the reason given will be considered race neutral. *Williams v. State*, 338 Ark. 97, 991 S.W.2d 565 (1999) (citing *Hernandez v. New York*, 500 U.S. 352 (1991)).

In this case it is unnecessary to analyze the first issue of whether Appellant established a *prima facie* case of racial discrimination. Once the party striking jurors offers a race-neutral explanation, and the trial court rules on the ultimate issue of intentional discrimination, the preliminary issue of whether a *prima facie* case was shown becomes moot. *Holder*, 354 Ark. 364, 124 S.W.3d 439; *Hernandez*, 500 U.S. 352. Here, the prosecution immediately offered race-neutral explanations to its strikes, which were considered by the trial court.

Thus, we turn to step two to determine whether the explanations offered were race neutral and whether the trial court erred in deciding that there was no *Batson* violation. The record reflects that one of the jurors was excused because the prosecutor's office had previously prosecuted her son on a robbery charge. A second juror was excused after stating that she did not have the authority to judge, did not want to judge, and did not feel mentally prepared to be a juror. A third juror was struck after stating that she had a child with the same last name as Appellant and that the two could be related. She also admitted to hearing rumors that the wrong people had been arrested in the Anderson murder. A fourth juror was struck after stating that he was friends with Jacqueline Curry, who was also charged with capital murder and aggravated robbery in this case. A fifth juror was excused after stating that she had been taught by nuns while growing up that she should not judge other people and that this feeling had been with her for her entire life and that she always abided by it. The State excused a sixth juror because he was evasive in answering questions and his answers indicated a lack of honesty. Finally, the State excused a

juror who had a close, personal relationship with Appellant's mother. After the State explained each of its reasons for the peremptory strikes, the trial court found no evidence of purposeful discrimination. We cannot say the trial court's findings with regard to *Batson* were clearly against the preponderance of the evidence.

Finally, we note that on appeal Appellant seems to be arguing that there was a *Batson* violation by virtue of the fact that the State excused a higher number of blacks from the jury. He makes no argument that the State's race-neutral explanations for the strikes were not genuine and thus established discriminatory intent. This court has previously rejected an argument that discriminatory intent can automatically be established based solely on an alleged pattern of strikes, stating:

> Reliance on numbers alone is not sufficient to prove a discriminatory intent. The United States Supreme Court in *Batson*, stated, "[f]or example, a pattern of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. A pattern certainly may provide facts showing a discriminatory intent if the pattern in fact shows a discriminatory intent. However, whatever facts are presented, they must give rise to an inference of purposeful discrimination. *Hinkston, supra.*

> Hence, mere pattern or process alone is not sufficient to establish a showing of a *Batson* violation unless the pattern shows a discriminatory intent. Here, London did no more than point to the number of African-American jurors struck from the *venire* panel. Therefore, London has failed to show the trial court erred in denying his *Batson* motion.

*London v. State*, 354 Ark. 313, 320-21, 125 S.W.3d 813, 817-18 (2003).

■ Here, just as in *London*, Appellant is arguing that a *Batson* violation occurred simply based on the fact that the State exercised seven of its peremptory challenges on African-American venire persons. Again, we reiterate that a pattern itself that shows no discriminatory intent does not rise to the level of a *Batson* violation. Accordingly, Appellant's argument on this point fails to demonstrate any error with regard to the trial court's rulings on his *Batson* challenges.

### III. Suppression of Custodial Statement

Next, Appellant argues that the trial court erred in failing to suppress his custodial statement because he did not make a knowing and intelligent waiver, nor was his statement voluntarily made. In support of this contention, Appellant argues that he cannot read or write and has an IQ in the range of 57–62, which means he is mentally retarded and, thus, lacked the capacity to make a valid waiver. In addition, Appellant argues that he confessed only after the officers interviewing him made threats against his family. The State counters that there was ample evidence demonstrating that Appellant's statement was voluntarily, knowingly, and intelligently made.

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Jordan v. State*, 356 Ark. 248, 147 S.W.3d 691 (2004); *Diemer v. State*, 340 Ark. 223, 9 S.W.3d 490 (2000). In other words, did Appellant waive his rights with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Sanford v. State*, 331 Ark. 334, 346, 962 S.W.2d 335, 341–42 (1998) (quoting *State v. Bell*, 329 Ark. 422, 432, 948 S.W.2d 557, 562 (1997)). In order to make this determination, this court reviews the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Jordan*, 356 Ark. 248, 147 S.W.3d 691; *Diemer*, 340 Ark. 223, 9 S.W.3d 490. This court will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Shields v. State*, 357 Ark. 283, 166 S.W.3d 28 (2004);

*Wright v. State*, 335 Ark. 395, 983 S.W.2d 397 (1998). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Winston v. State*, 355 Ark. 11, 131 S.W.3d 333 (2003). So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Howell v. State*, 350 Ark. 552, 89 S.W.3d 343 (2002).

Testifying at the suppression hearing was Special Agent Bishop, with the Arkansas State Police. According to Bishop, he and Sergeant Digman conducted an interview with Appellant at approximately 10:00 p.m. on April 23, 2003. Bishop testified that Appellant appeared to be alert and there was no evidence that he was intoxicated or under the influence of drugs. Bishop also stated that Appellant was not restrained during the interview, and when Bishop told Appellant that he wanted to talk to him about the Anderson murder, Appellant indicated that he did not mind talking to him. Bishop completed a *Miranda* rights form at approximately 10:06 p.m. He explained each question on the form, and Appellant verbally responded to each one, indicating that he understood the rights. Appellant also initialed each of his responses and signed the waiver. Bishop stated that during this process, Appellant appeared to be alert and responsive and did not seem to have any problem understanding his rights as they were explained to him. He also stated that at no time during the interview did he see any indication that Appellant suffered from mental retardation, nor did he give responses that were not age appropriate. Bishop further testified that initially Appellant denied any involvement in the crime, but that he ultimately gave a statement regarding his involvement in the robbery and murder. Bishop explained that he wrote out Appellant's statement, then read it to Appellant, who signed at the end of the statement. According to the statement, it concluded at 12:10 p.m.

Also testifying was Sergeant Digman, who participated in the interview of Appellant. Digman observed Bishop inform Appellant of his *Miranda* rights and also observed Appellant initial and sign the waiver form. According to Digman, there was nothing about Appellant's demeanor that indicated that he did not understand his rights. Digman further testified that he has experience with persons who are mentally retarded and that Appellant

never demonstrated any sign that he might be mentally retarded. Digman stated that Appellant consistently gave appropriate responses during the interview.

Deputy Martin testified that he picked Appellant up at his mother's house between 9:00 and 9:30 p.m. and took him to the jail for his interview. He took Appellant directly to the investigators and did not place him in any other room. Martin also testified that he has known Appellant for approximately six years and has seen him read magazines and the Bible.

Appellant testified that Deputy Martin came to his mother's home at approximately 6:05 p.m., and told Appellant to come with him. Appellant stated that once they arrived at the jail, Martin put him in a break room where he sat until approximately 11:00 p.m., while no one checked on him, offered him anything to eat, or allowed him to go to the bathroom. Appellant also testified that once Bishop began the interview, he did not advise him of his rights, but rather told him to initial and sign a piece of paper. Appellant also stated that he asked for his attorney, and the officers refused his request. According to Appellant, he told the officers that he was not involved in the Anderson murder and had been at a party the evening that the murder occurred. Appellant stated that he only confessed to the crime after the officers threatened to kill his six-year-old daughter and arrest his mother. He stated that Bishop then wrote out a statement and told him to sign it, which he did because he was afraid and scared. Appellant also testified that Bishop told him what to say during the taped interview. On cross-examination, however, Appellant admitted that he had not previously reported the alleged threats to any other police officer or to the trial court.

Dr. Wright testified that he is a licensed psychologist, who has experience evaluating mentally retarded persons and in studying false confessions. Dr. Wright explained that he spent approximately two hours with Appellant and also reviewed the handwritten statement and taped confession obtained in this case. Dr. Wright opined that based on Appellant's IQ range, he was not competent to waive his *Miranda* rights, as he was unable to give informed consent to questioning or to not having his attorney present. Dr. Wright clarified, however, that he had no opinion as to the issue of whether Appellant's statement was truthful or not. Dr. Wright also admitted that he based his conclusions solely on his interview with Appellant.

At the conclusion of the hearing, the trial court ruled from the bench that Appellant's motion to suppress was denied. The trial court pointed out that Bishop and Digman provided detailed information about the interview and that Appellant signed the rights form. The court further noted that their testimony was in stark contrast to that of Appellant and also stated that it was inconceivable that two officers with combined law enforcement experience of sixty years would threaten to kill Appellant's young daughter. The trial court also found the testimony of Dr. Wright to be less than credible, because Dr. Wright formed his conclusions based on information that he obtained solely from Appellant.

■ In addressing the merits of Appellant's suppression argument, we first turn to his assertion that he is mentally retarded and, thus, was unable to make a knowing, intelligent waiver of his *Miranda* rights. In reviewing this issue, we look at the totality of the circumstances. Appellant was twenty-one years of age at the time he gave the statement and had a high-school education. Appellant claimed that he could not read, but Special Agent Bishop testified that he read and explained the *Miranda* rights form to Appellant. Moreover, Appellant admitted to initialing and signing the *Miranda* rights form. This evidence was in contrast to Appellant's claim that he did not make a knowing and intelligent waiver. In support of his position, Appellant presented evidence that his IQ was in the range of 57–62, but that information was based on testing done when Appellant was eleven and sixteen. There was also testimony from Dr. Wright that because of Appellant's low IQ, he would be unable to knowingly and voluntarily waive his *Miranda* rights. The trial court, however, found Dr. Wright's testimony to be less than credible in light of the fact that Dr. Wright based his opinion solely on information he obtained from Appellant. As previously stated, we defer to the trial court's superior position to resolve conflicts in testimony. *See Winston*, 355 Ark. 11, 131 S.W.3d 333. In light of this deference, we cannot say that the trial court erred in finding that Appellant made a knowing and intelligent waiver of his *Miranda* rights.

■ Likewise, we believe that Appellant's statement was voluntarily given and was not the product of coercion or deception. Appellant avers that he confessed after Bishop threatened to kill his young daughter and arrest his mother. We cannot say that the trial court erred in finding that Appellant's testimony on this point was not credible. As the trial court pointed out, Bishop and

Digman had almost sixty years' combined law enforcement experience. They denied making any threats in order to coerce a confession from Appellant. Appellant himself admitted that he did not previously report the alleged threats to anyone else. As it is the province of the trial court to determine the credibility of witnesses, we cannot say that it was error for the trial court to find Bishop's and Digman's testimony more credible than the self-serving testimony of Appellant. Accordingly, the trial court did not err in denying Appellant's motion to suppress.

## IV. Exclusion of Expert Testimony

Appellant's next argument is that the trial court erred in refusing to allow Dr. Wright to testify as an expert witness regarding the credibility and weight of Appellant's custodial statement. Specifically, Appellant argues that pursuant to *Crane v. Kentucky*, 476 U.S. 683 (1986), he had the right to present a meaningful defense that included evidence of the physical and psychological environment surrounding his custodial confession. According to Appellant, the trial court's refusal to allow Dr. Wright to testify resulted in a violation of his Sixth and Fourteenth Amendment rights to present a meaningful defense. The State counters that it was appropriate for the trial court to exclude the testimony, because such testimony would have invaded the jury's role as the sole factfinder. The State is correct.

Rule 702 of the Arkansas Rules of Evidence entitled "Testimony of Experts" reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This court has held that if some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2002). Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Jackson v. State*, 359 Ark. 297, 197 S.W.3d 468 (2004); *Brunson*, 349 Ark. 300, 79 S.W.3d 304.

■  Here, Appellant sought to introduce the testimony of Dr. Wright. The proffered testimony consisted of Dr. Wright explaining his work in cases where false confessions had been obtained, particularly in situations where the person confessing has a diminished IQ. He then explained that he met with Appellant and determined that based on his IQ, it was not possible for Appellant to give informed consent to questioning or to waive his *Miranda* rights. According to Dr. Wright, it was possible that Appellant could have been coached into making the inculpatory statements. The trial court determined that this testimony was not admissible under Rule 702, because it would invade the jury's role as factfinder and weigher of the credibility of testimony. We cannot say that this ruling was in error.

This court stated in *Parker v. State*, 333 Ark. 137, 968 S.W.2d 592 (1998), that under Rule 702, the trial court must determine whether the evidence is likely to confuse or mislead the jury. The proponent of the evidence bears the burden of proof. *Id.* In *Parker*, the appellant wanted to introduce expert testimony calling into doubt eyewitness testimony. The trial court refused to allow the testimony on the basis that his proffered testimony was a matter of common knowledge and would not assist the jury. This court affirmed, stating:

> A critical factor in determining the admissibility of expert testimony is whether the facts and circumstances of the case are beyond the jury's ability to comprehend and draw its own conclusions. *Utley*, 308 Ark. 622, 826 S.W.2d 268. In *Utley*, this court held that the trial court did not abuse its discretion by excluding testimony similar to Dr. Zimmerman's testimony regarding the unreliability of eyewitness testimony. The eyewitness in *Utley* testified that she looked at the appellant's face for a maximum of thirty seconds, due to her extreme fright. In affirming the trial court's decision not to admit the expert testimony, this court considered important that the defendant had cross-examined the witness; that the expert's testimony would not aid an average-intelligent juror; and that the prejudice would have far outweighed any probative value of the testimony. This court agreed that the expert testimony would not have been helpful to the jury and would have, in fact, usurped the jury's role as the trier of fact. This court also noted that the vast majority of jurisdictions had upheld decisions excluding this type of expert testimony. *See also Jones v. State*, 314 Ark. 289, 862 S.W.2d 242 (1993).

*Id.* at 146, 968 S.W.2d at 596-97.

■ We find the rationale set forth in *Parker* to be applicable in the instant case. Appellant had the opportunity to cross-examine the investigating officers regarding the custodial interrogation. Moreover, Appellant took the stand and testified to his version of the events surrounding his custodial interrogation. Nothing else that Dr. Wright might have added would have been of any assistance to the jury. And, finally, the prejudice that would have resulted from Dr. Wright's testimony regarding his opinion of the voluntariness of Appellant's confession would have far outweighed the probative value of the evidence, because such testimony would have usurped the jury's role as the trier of fact. Accordingly, we cannot say that the trial court erred in granting the State's motion *in limine*.

### V. Overlap of Instructions

Next, Appellant argues that the jury's verdict is based on speculation and conjecture because the jury did not understand the differences in the instructions between capital murder and first-degree murder. The State correctly asserts that this court has repeatedly rejected arguments regarding the overlap between the capital murder and first-degree murder statutes.

In *Porter v. State*, 358 Ark. 403, 191 S.W.3d 531 (2004), this court addressed an argument similar to Appellant's and pointed out that such an argument harkens back to the argument that the statutes defining the offenses of capital murder and first-degree murder are unconstitutionally vague, an argument which has been rejected time and again by this court. *See also Williams v. State*, 346 Ark. 54, 56 S.W.3d 360 (2001); *White v. State*, 298 Ark. 55, 764 S.W.2d 613 (1989); *Cromwell v. State*, 269 Ark. 104, 598 S.W.2d 733 (1980). In those cases, we found no constitutional infirmity in the overlapping of the two statutes, because there is no impermissible uncertainty in the definitions of the offenses. *Id.* In so holding, the court explained that it is impossible to avoid the use of general language in the definition of certain offenses. *Id.*

■ In this case, Appellant acknowledges our long line of cases holding that there is no impermissible overlap between the two statutes, but argues that the jury in this case suffered from an impermissible uncertainty, as evidenced by the note they sent to the trial court stating that they could not discern a difference

between capital murder and first-degree murder. This uncertainty, according to Appellant, means that the jury's verdict was the result of speculation. As this court recognized in *Porter*, there is a presumption that the model instruction is a correct statement of the law, and Appellant has cited no authority in support of his position sufficient to overcome this presumption. *See also McCoy v. State*, 348 Ark. 239, 74 S.W.3d 599 (2002). In the absence of any convincing argument to the contrary, we adhere to our previous decisions that there is no unconstitutional overlap between the capital murder and first-degree-murder statutes. Accordingly, Appellant's argument on this point is without merit.

### VI. Instruction on Lesser-Included Offense

As his final point on appeal, Appellant argues that it was error for the trial court to refuse to instruct the jury on the lesser-included offense of second-degree murder. The State counters that there was no basis for such an instruction as Appellant's defense throughout the trial was that he was innocent.

We have repeatedly stated that it is reversible error to refuse to instruct on a lesser-included offense when there is the slightest evidence to support the instruction. *See, e.g., McDuffy v. State*, 359 Ark. 180, 196 S.W.3d 12 (2004); *Pratt v. State*, 359 Ark. 16, 194 S.W.3d 183 (2004). However, we have made it clear that we will affirm a trial court's decision not to give an instruction on a lesser-included offense if there is no rational basis for giving the instruction. *Id.* Once an offense is determined to be a lesser-included offense, the circuit court is not obligated to instruct the jury on that offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense. *See* Ark. Code Ann. § 5-1-110(c) (Repl. 1997).

The question before us, then, is whether a rational basis existed for giving Appellant's requested second-degree murder instruction. Stated differently, was there evidence, however slight, that supported giving the instruction. This court has held that for a defendant to be entitled to an instruction for the lesser-included offense of second-degree murder, he "must be able to point to evidence in the record that supports a finding that he acted with a 'knowing' mental state rather than a 'purposeful' mental state[.]" *Britt v. State*, 344 Ark. 13, 23, 38 S.W.3d 363, 370 (2001).

■    In the instant case, Appellant is unable to point to any evidence in the record that would support a knowing mental state rather than a purposeful mental state. Appellant proclaimed his innocence throughout the trial, and even took the stand in his own defense, denying any involvement in the Anderson murder. It is well settled that in cases in which a defendant makes a claim of innocence, no rational basis exists to instruct the jury on a lesser-included offense because the jury need only determine whether the defendant is guilty of the crime charged. *Atkinson v. State*, 347 Ark. 336, 64 S.W.3d 259 (2002). Thus, it was not error for the trial court to refuse to instruct the jury on the lesser-included offense of second-degree murder.

■    Moreover, the jury in this case was instructed on both capital murder and first-degree murder, but convicted Appellant of the greater offense of capital murder. Therefore, under the skip rule, Appellant cannot claim that he was prejudiced by the trial court's failure to give the lesser-included instruction. The skip rule provides that when a lesser-included offense has been given, and the jury convicts of the greater offense, error resulting from the failure to give an instruction on another still lesser-included offense is cured. *McFarland v. State*, 337 Ark. 386, 989 S.W.2d 899, *cert. denied*, 528 U.S. 933 (1999).

### VII.  Rule 4-3(h) Review

The record in this case has been reviewed for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.