RITA W. GRUBER, Chief Judge
A jury found appellant, Aaron Crift, guilty of first-degree murder in connection with the shooting death of James Murray. He was sentenced as a habitual offender and received 50 years for the murder and 15 years as an enhancement for the use of a firearm in the commission of the offense. On appeal, appellant argues that the circuit court erred by declining to instruct the jury on manslaughter as a lesser-included offense of capital murder and first-degree murder. We find no error and affirm.
On June 22, 2016, Sgt. Rowland Dorman of the Pine Bluff Police Department responded to a shooting call at 315 West Fifteenth St. He found James Murray slumped in a corner on the front porch with a gunshot wound to his forehead. Sergeant Dorman learned that the shooter was a black male who left the scene in a white Jeep with a black male and a white female. Sergeant Dorman immediately broadcasted the information over the radio.
Det. Mike Sweeney was on his way to the scene when he heard the broadcast and spotted a vehicle matching the description approximately ten blocks from 315 West Fifteenth St. As he approached the vehicle, he saw a black male wearing a yellow shirt flee from the driver's side. He made contact with Deonna Logue, the female passenger in the backseat. Detective Sweeney and other detectives who arrived on the scene set up a perimeter around a house because of the presence of the vehicle matching the description of the car that was fleeing the scene of the shooting, and the male wearing the yellow shirt had exited the vehicle and had run inside the home. The man was later identified as Arthur "Jay" Paylor. When Detective Sweeney approached the home, Paylor and another man, Travis Roberts, came outside. Paylor acknowledged that the white Jeep belonged to him, and both men said that no one else was in the home.
Debra Scott lived at 1516 South Walnut St. She testified that on June 22, she saw appellant and a white female sitting on the porch at 1509 South Walnut St. and heard them talking about clothes. She heard appellant say in a loud tone, "He['s] going to give me your stuff." Scott went inside and soon after heard a loud pop. When she opened the door, she saw appellant running from around the corner with a gun and heard him say to the white female on the porch, "I just shot this mother* * * * * *." She then saw appellant and the white female run into the house. A short time later, she saw appellant and the white female get into a white SUV. Scott described the gun as having a silver barrel with a black handle. She also heard a lady *601 from Murray's house saying, "He shot my brother."
Travis Jackson testified that he lived at 1509 South Walnut St. and worked at Subway. He and appellant were as close as blood relatives. The night of June 21, Jackson had friends over, including appellant and Deonna Logue, who both spent the night at his home. When Jackson left for work, appellant and Logue were the only people remaining in the home. Around 12:00 p.m. he learned from a neighbor that his house was surrounded by police. He went home and the police told him a suspected murder weapon was inside. Jackson testified that he did not have a weapon in the house because he was a felon and not allowed to have a gun. He consented to a search of his home, and a long silver handgun with a black handle was recovered.
Deonna Logue had dated James Murray for three years but was dating appellant at the time of the shooting. She testified that they were at Jackson's house the day of the shooting, talking on the porch when appellant got mad and went inside. When he came back out, she asked him what he was doing, and he replied that he was going to talk to Murray. She knew Murray was staying at his sister's home around the corner. She testified that she was on the porch when appellant went around the corner, and it sounded like he and Murray were arguing. Shortly after he had left, Logue heard a gunshot, which sounded to her like it came from where Murray had been staying. She saw appellant with a gun when he came back around the corner, although she had not seen it when he left. She described it as silver with a black handle. Logue testified that when appellant returned, he told her he had shot Murray. He then called Paylor, who picked them up in a white Jeep. They then went to Paylor's cousin's house, where appellant and Paylor went inside. Logue stayed in the backseat. She explained that appellant would want to shoot Murray because they had been arguing over clothes that belonged to her that were in Murray's possession. She indicated that appellant was upset about threats they had made against one another and not the clothes, but that it all started with the clothes. About a month before the shooting, Logue had heard appellant say that he was going to "level" Mr. Murray's house.
Arthur "Jay" Paylor, Jackson's little brother, testified that on June 22, 2016, he was at Subway when he received a call from appellant around 11:00 a.m. to come get him at Jackson's house. Paylor testified that when he pulled up to his brother's house on Walnut Street, appellant and Logue got in his white Jeep. Paylor drove to appellant's cousin's house at 1222 West Fourteenth St. where he and appellant went inside while Logue stayed in the car. Paylor asked appellant what was going on when he saw the police surround his car. He testified that appellant told him that he had shot someone.
Sgt. Jason Howard assisted in the search of 1222 West Fourteenth St. because a homicide suspect was possibly inside the residence. Appellant was discovered inside a closet underneath some clothes.
Michael Gorman, Murray's brother, testified at trial that he had been at 315 West Fifteenth St. at the time Murray was shot. He stated that he answered a knock on the door around noon. When he opened the door, appellant told Murray he needed to speak to him. Soon after appellant and Murray had gone outside, Gorman heard yelling and then a gunshot. When Gorman opened the door, he saw appellant standing over Murray with a gun in his hand pointed at Murray, who had been shot in the head. Gorman went to call 911, and appellant was gone.
*602 Appellant testified in his defense that he did not shoot Murray and that he did not go to Murray's house on the day of the shooting. He claimed he was hiding the day he was arrested because he had an absconder warrant for his arrest for cutting off an ankle bracelet in February 2016.
After the defense had rested, the circuit court considered the jury instructions requested by the parties. The circuit court denied defense counsel's request for the manslaughter instruction and instructed the jury on capital murder, first-degree murder, and second-degree murder. The jury convicted appellant of first-degree murder. For his sole argument on appeal, appellant contends that the circuit court erred by declining to instruct the jury on manslaughter as a lesser-included offense of capital murder and first-degree murder.
It is reversible error to refuse to give an instruction on a lesser-included offense when the instruction is supported by the slightest evidence. Atkinson v. State , 347 Ark. 336, 349, 64 S.W.3d 259, 268 (2002) (citing Chapman v. State , 343 Ark. 643, 38 S.W.3d 305 (2001) ). The circuit court may refuse to offer a jury instruction on an included offense when there is no rational basis for a verdict acquitting the defendant of the charged offense and convicting him of the included offense. Id. Additionally, it is not error for the circuit court to decline to give the proffered instruction on the lesser offense when the evidence clearly shows that the defendant is either guilty of the greater offense charged or innocent. Id. In cases in which a defendant makes a claim of innocence, no rational basis exists to instruct the jury on a lesser-included offense because the jury need only determine whether the defendant is guilty of the crime charged. Id.
In the present case, the circuit court did not err in refusing to give the manslaughter instruction. Appellant argues that the evidence of his conduct after the shooting indicates shock, surprise, and panic. He points to the facts that he stood over Murray rather than immediately fleeing, that he incriminated himself in an excited utterance before telling Logue to go inside, and that he called Paylor in a spur-of-the-moment request for transportation to leave the vicinity. He claims that because of this evidence and the lack of eyewitness testimony that he intentionally pulled the trigger, the jury could have found that he "unintentionally fired the weapon while brandishing or otherwise handling it in a manner exhibiting conscious disregard of a substantial and unjustifiable risk that he would accidentally cause it to discharge and strike Murray."
In his defense, however, appellant testified that he did not shoot James Murray and that he did not go to his house on the day of the shooting. Considering his own testimony, the evidence clearly showed that appellant was either guilty of the offense charged or innocent. When a defendant makes a claim of innocence, no rational basis exists to instruct the jury on a lesser-included offense because the jury needs to determine only whether the defendant is guilty of the crime charged. Atkinson v. State , 347 Ark. 336, 349, 64 S.W.3d 259, 268 (2002). Based on his claim of innocence, there was no rational basis to instruct the jury on manslaughter as a lesser-included offense of capital murder or first-degree murder. Therefore, we cannot say that the circuit court erred in declining to instruct the jury on manslaughter.
*603 [1] We affirm.
Affirmed.
Harrison and Glover, JJ., agree.

Appellant's argument ignores the fact that the jury was instructed on the lesser-included offense of second-degree murder, but convicted of the greater offense of first-degree murder. This implicates the "skip rule" as mentioned by the State. The skip rule provides that when a lesser-included offense has been given and the jury convicts on the greater offense, any error resulting from the lack of instruction on another lesser-included offense is cured. Flowers v. State , 362 Ark. 193, 214, 208 S.W.3d 113, 129 (2005).