Jerry Wayne PEMBERTON *v.* STATE of Arkansas

CR 86-178                                   730 S.W.2d 889

Supreme Court of Arkansas
Opinion delivered June 8, 1987

*Bill E. Ross*, for appellant.

*Steve Clark*, Att'y Gen., by: *Robert A. Ginnaven, III*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant was accused of capital murder for having killed Charles E. Brown. He was convicted of first degree murder and sentenced to forty years imprisonment. Three points of appeal are raised, the first of which

is that the state was allowed to ask one of its own witnesses about a prior inconsistent statement the witness had made. Secondly, the appellant contends that the evidence was insufficient to support the jury's verdict. His third point is that the trial court erred in failing to instruct the jury on the lesser included offense of manslaughter. We hold it was not error for the state to be allowed to elicit testimony from its own witness that she had made a prior inconsistent statement and that there was no error in failing to instruct on manslaughter. There was ample evidence to support the conviction.

On Sunday, March 3, 1985, the appellant was found asleep and intoxicated by the side of the road in a truck belonging to the decedent, Charles E. Brown, with the motor running. Police officers arrested him for public intoxication. When they asked the appellant whose truck he was driving, he answered that it belonged to Brown. The appellant was released on bond, and the truck was released to the appellant's brother who had come to the place where the appellant was being held. During the next few days, the appellant drove around in the decedent's truck.

The decedent's son, Danny Brown, an Arkansas State Trooper, lived in Piggott. The decedent's home was in or near Leachville. They stayed in pretty close touch. Danny Brown testified that after a day of being unable to reach his father by telephone, he called another state trooper, Sergeant Bill Corwell, whom he asked to check on his father. Sergeant Corwell went to the elder Brown's home and found him there dead on the evening of March 5, 1985. The state medical examiner testified that the death was caused by a gunshot wound just below the ear. A ballistics expert testified that the wound was caused by a Marlin, Model 60, .22 caliber rifle. Although some $1,000 was found concealed in the decedent's home, no money was found in his pockets.

There was undisputed testimony that it was known that the decedent carried large sums of money in his pocket because of his business as a "trader" who commonly bought and sold items to earn his living. There was also testimony that the appellant was out of a job and had no other source of income and that he had had access to a Marlin .22 rifle which belonged to his brother. The appellant testified that he and Wilma had been out shooting the

rifle near the time the crime occurred, but that he had sold the rifle to a person at a bar for $25, and that this sum, plus others he had obtained by gambling had enabled him to have the money to post the bond when he was arrested for public intoxication, and was the source of the money observed on his person by Wilma, between March 3 and March 5, and by another woman, Madonna McElhaney, with whom he had consorted for a time on March 3.

Wilma Honeycutt's brother, Jeffery Chadwick, testified that on a day early in March the appellant and Wilma came to the apartment occupied by Jeffery and his wife, Tammy, and asked if they could stay the night. He noticed a pickup truck near his apartment when the appellant and Wilma arrived, and he asked the appellant if they had arrived in the truck. The appellant denied it. On March 5 or 6, Jeffery returned home from work, and he, Tammy, the appellant, and Wilma were watching the evening news which reported the homicide and indicated the authorities were searching for a thirty-five-year-old Leachville man. At that point, the appellant and Wilma went outside, and when they returned, the appellant spoke with Jeffery privately. He told Jeffery he "was the one that done it" and asked Jeffery to trade him his tennis shoes for the appellant's boots and to let the appellant use a sleeping bag. The appellant became the subject of a manhunt lasting several days. He gave himself up as officers were closing in on him near a levee on Eight Mile Creek.

At the commencement of the trial, counsel for the appellant made a motion in limine to prohibit the prosecution from asking Wilma about a statement she had made to the police to the effect that the appellant had told her at Jeffery's house that he, the appellant, had committed the crime. Wilma's testimony, as presented by the state, was that the appellant had said only that he was the one they were looking for, the inference being that he was being sought because he had been driving about in the decedent's truck. When the prosecutor began to ask Wilma about her previous statement, the appellant's counsel objected, and the court initially ruled that the prosecution could not ask about her prior inconsistent statement. However, in cross-examination of Wilma, the appellant's counsel asked: "Did you ever hear him, Jerry, make any statement, 'I'm the one that done it,' or 'the one they're lookin' for?'" Wilma responded: "I did not."

At that point, the prosecutor objected, saying that that had been the question he had been denied permission to ask, and the court ruled that the appellant's counsel had "opened the door" to allowing the prosecution to inquire. He then permitted the prosecutor to ask Wilma whether she had ever made a contradictory statement, and she replied that she had.

### 1. Impeachment

The appellant argues that *Roberts* v. *State*, 278 Ark. 550, 648 S.W.2d 44 (1983), is precedent for disallowing any reference whatever to Wilma's previous inconsistent statement. In that case, the son of the appellant told police he saw his father kill his mother with a pistol. In subsequent statements, and in his testimony, he said only that he was in another room and heard the shot. The first statement was introduced through the testimony of a deputy sheriff who read it to the jury. We held that was improper, but went on to say:

> We still must decide whether the trial court erred in allowing the State to impeach Richard, its own witness, with his . . . hearsay statement by asking him if he had in fact made the prior inconsistent statements. Under the circumstances of this case we believe the probative value of such testimony was far outweighed by the danger of unfair prejudice. Therefore, this evidence should have been excluded under Rule 403 . . . .

Thus, without saying why it was unfairly prejudicial, we held that "in the circumstances of [that] case," upon retrial, the state could not inquire whether the witness had made a prior inconsistent statement.

Whatever the unfair prejudice may have been in that case, we do not find it here. The ruling in the *Roberts* case that the prior statement itself could not be quoted into evidence as part of the impeachment process was consistent with prior Arkansas cases, and indicated that the adoption of A.R.E. 613 had not presaged any change in that respect. Note, 37 Ark. L. Rev. 688 (1983). However, if we meant to say there that the fact that a reference to, rather than a quotation of, a prior inconsistent statement was unfairly prejudicial because it came in the form of the state's impeachment of its own witness, we failed to take

account of A.R.E. 607. That rule makes it clear that there no longer is a general prohibition against such impeachment. S. Perroni, *Impeachment of One's Own Witness by Prior Inconsistent Statements Under the Federal and Arkansas Rules of Evidence*, 1 UALR L.J. 1277 (1978).

■ In the case before us now, when the appellant's counsel, during cross-examination, asked Wilma whether she had heard the appellant say "he was the one that done it," the prosecutor's objection was that that had been the question he had been denied the privilege of asking. That was incorrect, as he had wanted to ask whether Wilma had previously made an inconsistent statement, not what Wilma had heard the appellant say. The trial judge found that the appellant's counsel had "opened the door" to allowing the prosecutor to ask, on redirect examination, whether Wilma had made a prior inconsistent statement. That ruling was correct because a party may inquire of a witness on redirect examination with respect to testimony given on cross-examination, and the scope of redirect examination is largely within the discretion of the trial judge. *Parker* v. *State*, 265 Ark. 315, 578 S.W.2d 206 (1979); *Stovall* v. *State*, 233 Ark. 597, 346 S.W.2d 212 (1961). While the *Parker* and *Stovall* cases are not cases in which impeaching testimony was taken on redirect examination, in view of Rule 607, discussed above, we do not find that distinction to be significant.

The state's argument on this point is that no error was committed because the appellant's statement to Wilma was an admission and thus qualifies for the exception to the hearsay rule found in A.R.E. 801(d)(2). That argument misses entirely the point that the question and answer complained of by the appellant went to Wilma's prior inconsistent statement, that is, what she had said, rather than asking her what the appellant had said. However, given our conclusion that the trial court did not abuse its discretion in permitting the question and the answer, we can disregard the state's argument and still affirm on this point.

## 2. Sufficiency of the evidence

■■ There was no eyewitness to the killing of the decedent. However, circumstantial evidence which is consistent with guilt of the appellant and inconsistent with other reasonable conclusions may form the basis of a verdict of guilty, and the role

of this court is only to determine whether the evidence was substantial. *Ward* v. *State*, 280 Ark. 353, 658 S.W.2d 379 (1983); *Blaney* v. *State*, 280 Ark. 253, 657 S.W.2d 531 (1983). In reviewing the evidence, we need only look to that which is favorable to the appellee to determine its sufficiency. *Mann* v. *State*, 291 Ark. 4, 722 S.W.2d 266 (1987).

The appellant's argument on this point is that he gave a plausible explanation for his having been in possession of the decedent's truck, *i.e.*, he stole it, and of his having recently been in possession of a rifle such as the one which killed the decedent, *i.e.*, he and Wilma were shooting it for fun, and of his being in possession of money despite lack of a job, *i.e.*, he won it and sold the rifle. (He does not, however, explain Jeffery Chadwick's testimony that the appellant admitted to him having killed the decedent.) He argues that the jury may not be allowed to disregard the testimony he presented, citing *Barnes* v. *State*, 258 Ark. 565, 528 S.W.2d 370 (1975). However, the appellant gives no reason for us to conclude that the jury ignored his testimony as opposed to merely not believing it which, of course, is the jury's prerogative.

### 3. Lesser included offense

■ The jury was instructed as to capital murder, first degree murder, and second degree murder. The appellant was found guilty of first degree murder. He argues it was error for the court to have refused his proffered instruction on manslaughter. There is no error in failing to give an instruction on one lesser offense if other lesser offenses were covered by the instructions given and the jury returned a verdict of conviction on an offense greater than the least offense instructed upon. *See Sherron* v. *State*, 285 Ark. 8, 684 S.W.2d 247 (1985); *Jones* v. *State*, 282 Ark. 56, 665 S.W.2d 876 (1984). There is no prejudice to the accused when that occurs.

Affirmed.