Darrell SMITH *v.* STATE of Arkansas

CR 93-219                                863 S.W.2d 563

Supreme Court of Arkansas
Opinion delivered October 18, 1993

*Joe Kelly Hardin*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. This is a first degree murder case in which the appellant, Darrell Smith, was convicted and sentenced to life imprisonment for killing George Sparlin. Smith's sole point of appeal is that the evidence was insufficient to support the conviction. We find the evidence was sufficient and affirm the conviction.

Police investigations produced a stream of circumstantial evidence which tied Smith to the shooting. From testimony the jury could have found these facts: Sparlin employed Smith on a part-time basis and on the night in question was working with Smith in his (Sparlin's) shop where heavy trucks were repaired. The shop was 30 to 40 yards away from Sparlin's home. Sparlin was last seen alive, other than by Smith, at 3:00 p.m. on February 1 by his step-son, Kevin Hopkins. Hopkins also heard Sparlin talking on the shop phone between 8:00 and 8:45 p.m. on that date. Kevin left the house with his girlfriend shortly after hearing the phone calls.

Chuck Fite was also employed by Sparlin, and on the night of February 1 Fite made a call to Sparlin about 8:00 p.m. asking if Sparlin needed him to come into work. Sparlin promised to come and pick Fite up. After waiting for a time without being picked up Fite called Sparlin again and was informed that Smith was at the shop and they were working. Sparlin informed Fite he would be there to pick him up in a short time. After another period of time Fite called again and Sparlin stated that Smith would pick him up shortly. Approximately 30 minutes later, Smith arrived to pick Fite up in a black four-wheel drive Chevrolet pickup.

Rather than take Fite directly to the shop, Smith, who said he needed to run an errand, drove to the home of David Givens. Givens also employed Smith, and there was testimony that Givens's wife and Sparlin were having an affair. Givens was not at home when Smith and Fite arrived. Smith then drove Fite to a point near Sparlin's shop and dropped him off. Fite found Sparlin in the garage dying from gunshot wounds. Fite called an ambulance which arrived five minutes after the call. He also called Sparlin's mother-in-law, Willene Hopkins, who lived nearby. She arrived within minutes.

Hopkins stated she had heard five or six shots from the direction of the shop around 9:30 p.m. February 1 and a short time later heard a truck leave the vicinity. Joy Batchelor lives about 100 yards from the Sparlin home, and as she was coming home around 9:30 that night, she encountered a black pickup truck coming out from in front of the shop at a high rate of speed. Debbie Batchelor was in the Batchelor home around 9:30 p.m. and heard five or six shots followed by the sound of a truck leaving. Cindy Batchelor was following her mother-in-law, Joy, home from work and also saw the black or dark blue Chevrolet pickup leave the shop at a high rate of speed. She stated the truck she saw was almost identical to one shown in a photograph of Smith's truck although she could not positively say they were the same.

Catherine Boyette was an EMT attendant on the ambulance which arrived at the shop. She found Sparlin unconscious but alive. He was taken to a hospital in Malvern. He was in a coma. Robert Fletcher, the nursing supervisor who treated Sparlin, observed a bullet fragment fall from one of his wounds. The fragment was later placed in the hands of the sheriff.

Bob Adams, Sheriff of Grant County, arrived on the scene of the shooting on February 1 at approximately 10:30 p.m. The ambulance had taken Sparlin away. At the scene Adams located five spent .22 cartridge casings, each of which was marked with a "C" on the end. After investigating at the scene Sheriff Adams went to Smith's home. Upon arrival he observed Smith's truck in the driveway. Adams glanced into the truck and observed a brick of .22 caliber shells of the same brand as those found at the scene of the shooting. When Adams entered the residence Smith denied knowing of the shooting. Adams asked Smith to come to the Sheriff's office with him, and as they were leaving, Adams observed blood on the back of Smith's trouser leg. He immediately advised Smith of his rights and arrested him.

Smith made a statement at the Sheriff's office in which he denied any involvement in the shooting and explained that he was injured while hunting earlier in the day. He stated he had changed his trousers and burned the ones he had been wearing earlier. He explained his failure to mention the gunshot wound to his leg to persons he spoke with later that evening as being due to

the fact that it was not bothering him that much. Smith also denied owning a .22 caliber pistol but said he owned a single shot .22 antique rifle. Later on in the investigation blood on the drivers side seat and a spent .22 cartridge casing were found in Smith's truck.

Alvin Brown, a Malvern resident, stated he observed Smith firing a .22 automatic pistol in front of Brown's house, for the purpose of "sighting it in" some three or four weeks before the shooting of Sparlin. Sheriff Adams located additional casings in Brown's yard which were later identified as having been fired from the same weapon as the bullets which struck Sparlin.

Tom Carden, a U.S. Army Recruiter, stated that three years before the shooting he had traded to Smith a .22 automatic rifle with a rotary clip which would fire 10 or 11 times in succession.

Lisa Sackevicius, a criminalist for the Arkansas State Crime Laboratory, testified that Smith was found to have a low level of the elements which may have been gunshot residue on his hands at the time of his arrest. The tests were not conclusive as there are environmental and occupational sources which could have been sources of the elements.

Dr. David DeJong, a forensic pathologist, performed the autopsy on Sparlin and concluded he died as the result of a gunshot to his head. There were four bullet holes in the body, and three bullets taken from the body were turned over to the Arkansas State Crime Laboratory.

Berwin Monroe, chief firearms and tool marks examiner for the Crime Laboratory, testified that all the bullets submitted were examined by him. He concluded the casings found in the Smith vehicle, the casings found at the Brown residence, the five casings found at the scene of the shooting, and the bullet removed from Sparlin were all fired from the same firearm.

After presentation of this testimony to the jury, counsel for Smith made a directed verdict motion on the basis that there was no physical evidence tying Smith to the commission of the crime and that the evidence was otherwise insufficient to sustain a guilty verdict. The motion was denied.

In defense Smith called his brother, Richard. Richard Smith

testified that he had traded a .22 caliber pistol to his brother Darrell at Christmas of 1991 in exchange for the .22 automatic rifle. Samantha Smith, Darrell's daughter, testified in his behalf that her father left their home about 8:30 p.m. on February 1 to go hunting and didn't return until around 10:00 p.m. Darrell Smith testified and explained his version of the events of February 1, denying any involvement in the shooting of Sparlin.

The defense rested and renewed the motion for directed verdict. The motion was again denied. The jury deliberated and returned a guilty verdict imposing a sentence of life imprisonment.

## 1. Sufficiency of the evidence

When the sufficiency of the evidence is challenged, we affirm if there is substantial evidence to support the verdict. *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990). Evidence is substantial if it is of sufficient force to compel reasonable minds to reach a conclusion that is beyond suspicion and conjecture. *Edwards* v. *State*, 300 Ark. 4, 775 S.W.2d 900 (1989). We have long held that circumstantial evidence alone may be sufficient to support a conviction. *Hurvey* v. *State*, 298 Ark. 289, 766 S.W.2d 926 (1989). Such evidence must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Pemberton* v. *State*, 292 Ark. 405, 730 S.W.2d 889 (1987). We review the evidence in the light most favorable to the appellee, considering only that evidence which tends to support the verdict. *Brown* v. *State*, 309 Ark. 503, 832 S.W.2d 477 (1992); *Hooks* v. *State*, 303 Ark. 236, 795 S.W.2d 56 (1990).

There is ample evidence to support the verdict in this case. Shell casings from the murder weapon were found in Smith's vehicle and a vehicle very similar to his was seen leaving the scene of the murder at a time shortly after the shots were heard. Smith's explanation for the recent wound in his leg, which he did not even mention to persons he spoke with after he allegedly shot himself, was absurd, and the jury obviously chose not to believe his story.

The credibility of witnesses is a fact question for the trier of fact. The trier of fact alone determines the weight to be given the evidence, and may reject or accept any part of it. *Smith*

v. *State*, 308 Ark. 390, 824 S.W.2d 838 (1992). Credibility determinations will not be disturbed on appeal when there is substantial evidence to support the fact finder's conclusion. *Campbell* v. *State*, 294 Ark. 639, 746 S.W.2d 37 (1988).

## 2. Rule 4-3(h) review

As Smith received a life imprisonment sentence, the record has been examined in accordance with Ark. Sup. Ct. R. 4-3(h), and there were no rulings adverse to Smith which constituted prejudicial error.

Affirmed.

HOLT, C.J., and DUDLEY and GLAZE, JJ., concur.

ROBERT H. DUDLEY, Justice, concurring. This concurring opinion is written to discuss an erroneous ruling, and, at the same time, to give notice to any new trial judge who might not be familiar with the rule concerning cameras and recording devices in the courtroom.

This case involves a sentence of life imprisonment. In cases of life sentences we must examine the record in accordance with Ark. Sup. Ct. R. 4-3(h) to determine if there are rulings adverse to the appellant which require reversal. In examining this record it is clear that a video camera was allowed to operate in the courtroom during the trial over appellant's objection. The trial court stated that the camera was set up in such a way that it would not cause a distraction and overruled the objection. The ruling was patently in error.

In 1980, in Canon 3(A)(7)(b) of the Arkansas Code of Judicial Conduct, we authorized, with many limitations, the broadcasting, recording, or photographing of trials, provided, among other things, "all parties and attorneys, whether depicted or not, and all witnesses that may be depicted or recorded have given written consent; the jurors shall not be depicted nor recorded." *See In re: Petition of Arkansas Bar Ass'n*, 271 Ark. 358, 362, 609 S.W.2d 28, 30 (1980).

Two years later, in *Ford* v. *State*, 276 Ark. 98, 633 S.W.2d 3 (1982), we issued a clear caveat about violation of this Canon. We wrote:

[S]afeguards have been adopted by Canon 3(A)(7) of the Code. A willful disobedience of this Canon would, no doubt, be dealt with in an appropriate manner which could go so far as to cause a retrial of the case or result in other action by this court. Since the trial of the appellant had been completed [when a camera was allowed] and the only thing left to do was to sentence him and only one sentence was to be imposed, we cannot hold that there was any prejudice to the appellant as a result of coverage by the media without prior approval.

*Id.* at 111-12, 633 S.W.2d at 11.

In 1982 we modified the Canon to eliminate the requirement of a written consent of all the parties, *see In re: Modification of the Code of Judicial Conduct Relating to Broadcasting and Photographing Court Proceedings,* 275 Ark. 495, 628 S.W.2d 573 (1982). In conjunction with that change, Canon 3(A)(7) was amended to read as follows:

A judge may authorize broadcasting, recording, or photographing in the courtroom and areas immediately adjacent thereto during sessions of court, recesses between sessions, and on other occasions, provided that:

(a) the participants will not be distracted nor will the dignity of the proceedings be impaired;

(b) an objection timely made by a party or attorney shall preclude broadcasting, recording or photographing of the proceedings; and, an objection timely made by a witness who has been informed of the right to refuse such exposure, shall preclude broadcasting, recording or photographing of that witness;

(c) the broadcasting, recording or photographing of any court proceeding will be in compliance with the rules adopted by the Arkansas Supreme Court;

(d) trials in juvenile court or concerning adoptions, guardianships and domestice relations shall not be subject to broadcasting, recording or photographing.

Ark. Code of Judicial Conduct Canon 3(A)(7) (1993).

In *Jim Halsey Co.* v. *Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985), we issued yet another warning. We wrote:

> The appellant acquiesced in the trial judge's ruling by failing to make further objections during the course of the trial. In this instance, the error was rendered harmless. The bench and bar should be on notice however that his court will closely scrutinize any further violation of this rule.

*Id.* at 471, 683 S.W.2d at 905.

In a supplemental opinion we wrote:

> Had the record in this case hinted of any prejudice to the appellant by the presence of cameras within the courtroom, reversal would be in order. Absent any prejudice, to reverse and remand *as punishment to the trial court* would not justify the time and expense for all parties and the court system to relitigate this matter.

*Jim Halsey Co.* v. *Bonar*, 284 Ark. 461, 473-B, 688 S.W.2d 275, 276 (1985) (supplemental opinion denying rehearing) (emphasis added).

The Canon has now become a part of the Administrative Rules. It is styled Administrative Order #6 and will be located in the "Court Rules" volume of the Arkansas Code Annotated as an appendix to the Arkansas Rules of Civil Procedure.

Under the rule, if a party objects, the trial judge must prohibit the recording or broadcasting of the trial. A fair trial without undue distractions is the paramount objective. In addition to the parties, the witnesses are given standing to object, and when a witness does so, the broadcasting or photographing must be prohibited. To rule otherwise might deprive the parties of the unhindered testimony of witnesses who might be reluctant to have their picture transmitted by television. Some confidential informants would easily come within this group. Jurors represent an even different interest. Jury service is a duty of citizenship, and many citizens are reluctant to serve, especially in cases involving habitually dangerous criminals, mob or gang members, or in cases they find personally embarrassing, such as deviate sexual activity cases. Jurors serve because the State asks them as good citizens to judge facts involving their peers. That is enough. They

should not additionally be subjected to worries or embarrassment that might come about by having their pictures transmitted by television or published in newspapers.

Trials in juvenile court or cases concerning adoptions, guardianships, or domestic relations are never subject to broadcasting, recording, or photographing.

In the case at bar, following jury selection, appellant's counsel objected to the videotaping of the trial by stating that he felt the presence of the camera in the courtroom would constitute a distraction to the jury and interfere with the fair administration of justice. The trial court erroneously overruled the objection. However, counsel did not make a sufficient record for reversal. We are not told whether the jurors were photographed, whether some or all of the witnesses were photographed, whether the videotaping was limited to counsel and the trial judge, or whether the camera did in fact cause a distraction. The record simply is insufficient to show any prejudice to the appellant. As we said in the supplemental opinion in *Jim Halsey Co.* v. *Bonar*, under these circumstances we will not reverse and remand solely as punishment to the trial court. 284 Ark. at 473-B, 688 S.W.2d at 276. Since appellant has not shown that he was harmed by the erroneous ruling, I join the majority in affirming the judgment of conviction.

HOLT, C.J., joins in this concurrence.

TOM GLAZE, Justice, concurring. Justice Dudley's concurring opinion suggests the trial court committed patent error when it allowed courtroom video taping conditioned upon the taping not being disruptive. I respectfully disagree with Justice Dudley's opinion because I believe the Judicial Canon provides some discretion with the trial judge who must decide such issues.

In pertinent part, Canon 3(A)(7)(a) provides that a judge may authorize photography in the courtroom provided neither the participants will be distracted nor the dignity of the proceeding will be impaired. Provision (b) of that section states that a party's or attorney's timely objection shall preclude photography.

This court has previously considered cameras in trial proceedings. In *Jim Halsey Co.* v. *Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985), Jim Halsey Co. objected to the use of cameras, but

the trial court allowed them so long as they did not become distracting. On appeal, this court held the trial court erred by disregarding Canon 3(A)(7), and although the majority court in *Bonar* announced its notice that further violation of this Canon would not be tolerated and "may well" result in automatic reversal, it affirmed the trial court's decision because prejudice was absent.

In *Ford* v. *State*, 276 Ark. 98, 633 S.W.2d 3 (1982), this court stated *willful* disobedience of Canon (A)(7) would, no doubt, be dealt with in an appropriate manner which *could* go so far as to cause a retrial. Nonetheless, the *Ford* court upheld the trial court's ruling to permit cameras because no prejudice was shown.

In sum, this court has never automatically reversed a case on appeal because a trial court allowed cameras over counsel's objection. This court has not modified Canon 3 since the *Ford* and *Bonar* decisions to put the bench and bar on notice that the mere violation of the Canon would result in automatic reversal.

Here, while Smith's counsel objected to video taping, he showed no prejudice resulting from the taping, presumably because none occurred. Smith neither argued below nor in this appeal that the trial court abused its discretion or that automatic reversal should occur from the trial court's ruling on the taping issue.

To date, this court has expressed that a retrial *could* occur if a trial judge willfully violated Canon 3(A)(7) and automatic reversal *may well* happen if a violation of the Canon is shown and no prejudice was involved. Obviously, this court has struggled during the past eight years or more over how cameras and video taping and media coverage should be handled and enforced at trial proceedings, but, as yet, the court has been unwilling to address this exact issue in its rules or canons. Other sanctions are available to the court to insure enforcement of Canon 3 rather than declaring error and requiring automatic reversal and retrial of a case which otherwise was tried without flaw, prejudice or impairment to a fair trial. If this court should decide to enforce Canon 3 by declaring error and reversing, I feel the court should notify the bench and bar by saying so in our canons and rules. Perhaps, with modern-day technology as it is, this court's study

and consideration of this subject might lead it to clarify its rules to permit non-intrusive or non-disruptive videotaping in many, if not most, cases. In any event, trial courts should have discretion in making these decisions.