2009 Ark. App. 604

**T.C., a minor, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CA 08–1306.**

Court of Appeals of Arkansas.

Sept. 23, 2009.

"835"quency

Dorcy K. Corbin, Pulaski County Public Defender's Office, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Deborah Nolan Gore, Ass't Att'y Gen., for appellee.

ROBERT J. GLADWIN, Judge.

Appellant, T.C., is a minor who was adjudicated delinquent on the charge of second-degree murder on April 3, 2008, in Ouachita County Circuit Court. On August 15, 2008, a disposition hearing was held and appellant was committed to the Division of Youth Services (DYS) and, if released prior to his eighteenth birthday, to be placed on probation until his eighteenth birthday. He appeals the delinquency finding and disposition, raising six points for our review. We affirm.

On August 7, 2006, officers with the Camden Police Department responded to a call from appellant's home where he lived with his mother and eleven-year-old sister. Appellant and his mother discovered the sister dead in her bedroom and called the police around 11:45 a.m. When police arrived, appellant and his mother waited outside in a relative's car, and at the request of police, were driven by relatives to the police station. At approximately 4:30 p.m., appellant's mother was the first to be interviewed, while appellant remained in the station's break room with family. The mother's interview was videotaped, and it lasted for approximately one hour. Appellant was then interviewed by police from about 5:30 p.m. to 6:45 p.m. This interview was also videotaped. Appellant was read his *Miranda* rights about forty-five minutes into the interview. He agreed to waive his rights and initialed and signed a waiver form. During the interview, appellant told officers he was thirsty, and he was brought water. Later he told officers he was hungry, and the interview was stopped while appellant was given food.

Appellant was allowed to eat in another office. During appellant's dinner, Deputy Prosecuting Attorney Gregg Parrish sat with appellant for five to ten minutes. The prosecutor testified that he chatted with appellant about school, video games, and what kinds of things his sister liked. He testified that he did not discuss the case with appellant, keep appellant from leaving the room, or threaten appellant by mentioning the death penalty, and neither he nor anyone in his presence otherwise threatened appellant or promised him anything.

While appellant was in the office where he had eaten dinner, several police officers were in and out of the room, speaking with

appellant about general things, and then specifically about what had happened the previous night with his sister. After he admitted to the officers that he placed plastic bags over his sister's face and bound her hands and feet, appellant was taken to the interview room to record his confession.

At approximately 10:20 p.m., Officer Evin Zeek again advised appellant of his *Miranda* rights and asked whether he understood each of them. When Officer Zeek read the waiver to appellant, appellant asked him to explain what a "waiver" is. The officer explained that it means he is deciding to give a statement of his own free will, that he has not been promised anything or threatened in any way, and that he is making a statement to the police solely because he wants to. Appellant then indicated that he understood and signed the waiver form. Appellant then confessed to the officers what he had told them earlier.

A petition was filed August 15, 2006, in the Ouachita County Circuit Court seeking a declaration that the juvenile be found delinquent pursuant to Arkansas Code Annotated section 9–27–303 (Repl.2008), and charging him with first-degree murder in the death of his sister. By order filed November 22, 2006, the trial court found appellant fit to proceed and had the capacity to: possess the necessary mental state required for the offense charged; conform his conduct to the requirements of the law; and appreciate the criminality of his conduct.

Appellant filed a motion to suppress on February 13, 2007, claiming that his statement to police was elicited in violation of his rights guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States. He claimed that he did not knowingly, intelligently and voluntarily consent to giving a statement or waiving counsel due to his immaturity. He further claimed that his mother was not an appropriate person to consent to his questioning and taping as she was also a suspect. He claimed that he should have had an ad litem appointed before questioning; that the questioning was inordinately long; and, that his statements were coerced because the deputy prosecuting attorney threatened to charge him as an adult. As a result, he claimed that his statement was involuntary and/or false and should be suppressed.

By order of June 27, 2007, the State's request to have appellant's case designated as an Extended Juvenile Jurisdiction (EJJ) case pursuant to Arkansas Code Annotated section 9–27–501 (Repl.2008) was granted.[1] Appellant filed a motion to reject waiver and supplemental motion to suppress on July 27, 2007. On August 27, 2007, the State amended its petition against appellant charging him with murder in the second degree. On August 31, 2007, and October 29, 2007, the trial court held a hearing regarding the pretrial motions and denied appellant's motion to suppress statement and motion to reject waiver and supplemental motion to suppress.

By order filed March 18, 2008, the trial court specifically found that the State met its burden in proving that the waiver of right to counsel signed by appellant and his mother prior to appellant's confession was freely, voluntarily and intelligently made. The trial court further found that under the totality of the circumstances the statement made by appellant should not be suppressed. The trial court found that

1. An "extended juvenile jurisdiction offender" means a juvenile designated to be subject to juvenile disposition and an adult sentence imposed by the court. Ark.Code Ann. § 9–27–303(23).

appellant understood the consequences of the waiver and that it was not the result of any coercion, force or inducement. Further, that the confession was not unreliable and was given of appellant's own free will. The trial court found no violations of Rules 2.2 or 2.3 of the Arkansas Rules of Criminal Procedure (2008) or Arkansas Code Annotated section 9–27–317(h) (Repl.2008).

A bench trial was held March 18, 19, 20, and 24, 2008. A "Brief in Support of Motion to Dismiss" was filed April 2, 2008, alleging that the State failed to prove each and every element of murder in the second degree, therefore, the charge should be dismissed. On April 3, 2008, the trial court denied the motion in a ruling from the bench and discussed its reasoning:

> We were talking about a time period off camera. Defendant, juvenile gives a statement. There's a time period off camera in which he talks to other officers, talked to the deputy prosecuting attorney, a meal comes in and a lot goes on off camera, a substantial amount of time. Then there's a confession. So you have a recorded denial, time off camera, confession comes during the time off camera, and then an on-camera confession. The defense made reference to the fact that in and of itself is a basis to suppress because of the time off camera. Something had to happen. That's true. What went on during the time off camera is crucial. The State came forward and called witness after witness to testify and explain what occurred off camera. They called all the officers that were in contact. They called the prosecuting attorney. There was no evidence presented about what happened off camera, other than what the State's witnesses offered. The Court did comment because the defense was alleging that things could have been said to the juvenile that overcame his will and showed coercion to make him say what he said. In a suppression hearing, when talking, the Court didn't use the fact that the juvenile remained silent against him, the Court merely commented on the fact that the State had come forward and explained what happened during that time period. And there was nothing else there offered to say something other than what the State's witnesses said happened during that lapsed period.... But the arguments that were made by the defense about things occurring off camera, they provided no evidence of any things that occurred off camera to refute the version offered by the State. So I can't assume things occurred when there's no evidence before the Court for the Court to attach something to. All I had was people who were there said, "This did not happen. This is what occurred." All the Court could do under those circumstances, it found them credible. They were cross examined. They still came across as credible....

The trial judge elaborated on the evidence before him and explained his ultimate finding that the evidence was clear beyond a reasonable doubt that appellant committed the offense by knowingly engaging in the conduct that led to his sister's death. The trial court found that the State met its burden of proof in establishing the elements for second-degree murder, adjudicating "True" on the amended petition.

After a disposition hearing held August 15, 2008, the trial court committed appellant to DYS. The trial court stated that in the event appellant is released prior to his eighteenth birthday, appellant will be placed on probation until his eighteenth birthday. This appeal followed.

## I. *Sufficiency of Evidence*

We are obligated to first address appellant's sufficiency-of-the-evidence argument

because of double-jeopardy considerations. *See Stenhouse v. State*, 362 Ark. 480, 209 S.W.3d 352 (2005). Appellant contends that assuming that his confession was both reliable and credible, there was a total failure to prove that he knowingly murdered his sister.

He argues that his confession reflects that he did not know that she had died. He refers to binding her hands and feet to slow her down when she got out of bed. He denied having any intent to hurt his sister. He told police that he held a Walmart bag over her head and she jerked, so he stopped. Then he bound her hands and feet to slow her down, thinking that she would eventually come after him. He claimed that he later went back to his sister's room to loosen the bag so that air could "get in there." He maintains that the act of loosening the bag does not constitute second-degree murder. Nor does it constitute extreme indifference to the value of human life. Appellant argues that in light of the circumstances surrounding the police actions and words in obtaining the confession, the inconsistencies in the testimony of the officers, and the prosecuting attorney, the actions of police after appellant had been arrested and charged, established that the State failed to prove the charge against appellant beyond a reasonable doubt and the case should be dismissed.

■ The standard of review for sufficiency of the evidence in a juvenile proceeding is the same as in a criminal case. *Pack v. State*, 73 Ark.App. 123, 41 S.W.3d 409 (2001). In reviewing a juvenile-delinquency case, we look at the record in the light most favorable to the State to determine whether there is substantial evidence to support the conviction. *J.R. v. State*, 73 Ark.App. 194, 40 S.W.3d 342 (2001). Substantial evidence is evidence of sufficient force and character that it will, with rea-

sonable certainty, compel a conclusion one way or the other, without mere speculation or conjecture. *Id.* In determining whether there is substantial evidence, we only consider that evidence tending to support the verdict, and we do not weigh the evidence presented at trial, as that is the responsibility of the finder of fact. *Pack, supra.*

Pursuant to Arkansas Code Annotated section 5–10–103 (Repl.2006), a person commits murder in the second degree if: (1) The person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life; or (2) With the purpose of causing serious physical injury to another person, the person causes the death of any person. A person acts "knowingly" with respect to a result of his or her conduct "when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark.Code Ann. § 5–2–202(2)(B) (Repl.2006).

■ The State argues that the trial judge, as fact-finder, was not required to believe the testimony of any witness, especially that of the accused, as he is the person most interested in the outcome of the case. *Winbush v. State*, 82 Ark.App. 365, 107 S.W.3d 882 (2003). Further, the record contains evidence that, prior to his confession, appellant lied to police about the nature and extent of his contact with his sister that night. The trial judge was free to view this evidence as an attempt by appellant to cover up his behavior, and, as the trier-of-fact, the judge could have considered evidence of cover-up as proof of a purposeful mental state. *See Steggall v. State*, 340 Ark. 184, 8 S.W.3d 538 (2000). Further, appellant stated to police that he used two bags because he noticed a hole in one of the plastic bags. He also told police that he held onto the bag too long, which indicates his understanding that holding a plastic bag over someone's face

may result in death. He also said he held the bags over his sister's face until she started twitching. He then left the bags on her face and returned to the living room. Such evidence, viewed in light of the fact that appellant was almost thirteen years old at the time of the crime and of above-average intelligence, was sufficient to establish that he, regardless of whether he intended to kill his sister, acted knowingly when he held plastic bags tightly over her face.

Finally, the trial judge did not have to believe appellant when he claimed to have returned to his sister's room to loosen the bags on her face. Moreover, the conduct at issue is not that which occurred after the victim's death, but that which caused her death. The State argues that appellant's conduct in ensuring that the bags did not contain holes through which air could pass, holding the bags tightly over his sister's face until her body began to twitch, and leaving them there when he left the room constitutes extreme indifference to the value of her life. We agree. Accordingly, we hold that the trial judge properly denied appellant's motion to dismiss.

## II. *Motion to Suppress*

In reviewing a trial court's ruling denying a motion to suppress a confession, we make an independent determination based upon the totality of the circumstances. *Wedgeworth v. State,* 374 Ark. 373, 288 S.W.3d 234 (2008). We review the trial court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court. *Clark v. State,* 374 Ark. 292, 287 S.W.3d 567 (2008). The ruling will be reversed only if it is clearly against the preponderance of the evidence. *Gril-*

*lot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003).

The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Id.* Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Id.*

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Flowers v. State,* 362 Ark. 193, 208 S.W.3d 113 (2005). In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id.* To make this determination, we review the totality of the circumstances surrounding the waiver, including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* We will reverse a trial court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id.*

Appellant argues that without his confession, the State would have no evidence

to charge him with the death of his sister. He claims that the physical evidence does not support his statements and that the State withheld recorded exculpatory testimony that pointed to appellant's mother as the killer. He maintains that the circumstances surrounding his detainment, interrogation, and eventual confession are appalling.

Appellant points out that when asked to go to the police department, he and his mother went. He claims that the officers repeatedly assured him that they were there to help him during his on-camera interview. He maintains that he was told to sit back down when he asked for something to drink. After more than an hour of police interrogation, he was crying, and he kept insisting that he had not killed his sister. At 6:45 p.m., he told police he had not eaten all day and was hungry. He was escorted from the interview room to a police officer's office. An officer went to purchase food for him and another officer, either alone or with the prosecutor, stayed with appellant while he waited and while he ate his food. He claims that an officer came in and began talking to him as he was eating. He claims that shortly thereafter, the interim captain requested another officer to go in with appellant to help with the questioning.

Meanwhile, the mother's interview was proceeding on camera. Around 8:45 p.m., an officer stepped into her interview room and told the mother that they were still talking to appellant, and that they were "professionals." He claims that between 6:45 p.m. and 10:00 p.m., the police entered the mother's interview room multiple times and made it clear through their remarks that appellant was being talked to elsewhere and they were trying to get him to confess.

Appellant argues that what was said to him during the three and a half hours is unknown because the police chose not to record the interview. He claims the testimony of the police officers accounts only for about thirty minutes of time. When appellant was recorded at 10:21 p.m. he was read his rights, and he asked, "What is a waiver?" He claims that the officer said, "It simply says what you are saying, you are doing of your own free will." Therefore, he argues the police failed to adequately explain the waiver and failed to explain its potential consequences. He then confessed that he had put bags over his sister's head, had tied her up so she would not come after him, and had hidden his mother's wallet. When his mother was brought in, he whispered to her that he did not kill his sister, then stated loud enough for the videotape that he did kill his sister. After this confession, he asked if he could leave to go home.

The State points out that when the statement at issue was elicited from a juvenile, the court also considers the circumstances set forth in Arkansas Code Annotated section 9–27–317 (Repl.2008), as follows:

(c) In determining whether a juvenile's waiver of the right to counsel at any stage of the proceeding was made freely, voluntarily, and intelligently, the court shall consider all the circumstances of the waiver, including:

(1) The juvenile's physical, mental, and emotional maturity;

(2) Whether the juvenile understood the consequences of the waiver;

(3) In cases in which the custodial parent, guardian, or custodian agreed with the juvenile's waiver of the right to counsel, whether the parent, guardian, or custodian understood the consequences of the waiver;

(4) Whether the juvenile and his or her custodial parent, guardian, or custodian

were informed of the alleged delinquent act;

(5) Whether the waiver of the right to counsel was the result of any coercion, force, or inducement;

(6) Whether the juvenile and his or her custodial parent, guardian, or custodian had been advised of the juvenile's right to remain silent and to the appointment of counsel and had waived such rights; and

(7) Whether the waiver was recorded in audio or video format and the circumstances surrounding the availability or unavailability of the recorded waiver.

Ark. Code Ann. § 9–27–317(c).

The State contends that the facts set forth above show that the circumstances surrounding appellant's waiver of rights demonstrate that it was both voluntary and intelligent. He arrived at the police station voluntarily with his family. He was both intelligent and emotionally mature. While he was at the police station for several hours, he was not being continually interrogated, and he was promptly provided with food and drink upon request. He was advised of his *Miranda* rights on two occasions before giving his taped confession, and indicated each time that he understood and wished to waive his rights. The officers confirmed that appellant was neither promised anything nor threatened or coerced into waiving his rights. The only specific allegation of misconduct—that the prosecuting attorney told appellant that he could receive the death penalty if tried as an adult—was flatly denied by the prosecutor. Finally, there was no evidence that appellant was under the influence of drugs or alcohol at the time he decided to waive his rights.

### A. *Waiver*

■ Appellant contends that the trial court erred in finding that appellant's waiver of rights was freely, voluntarily, and intelligently made. He maintains that because the information obtained from him prior to the time he was given his *Miranda* rights was used to elicit his confession, the confession should have been suppressed as a result of an illegal interrogation. *See Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ We note that police officers are not required to read *Miranda* warnings to every person they question; nor are they required to do so solely because the questioned person is a suspect. *E.g., State v. Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995). *Miranda* warnings are required only when there have been such restrictions placed on a person's freedom as to render the person in custody. *Id.* Here, appellant was not ordered to go to the police station, he was not handcuffed or otherwise restrained while there, he was not prevented from leaving, and officers testified that he was not in custody.

Appellant points out that the first time he was read his rights was around 5:50 p.m. At 10:21 p.m., he was asked to sign another waiver. He asked, "What is a waiver?" He claims that the explanation was that, "It simply says that what you are saying, you are doing of your own free will." He asserts that this court should not have to look past this exchange to conclude that appellant did not understand what a waiver was or its consequences.

However, the law requires the court to look past the exchange and weigh and consider numerous factors in assessing the validity of a waiver. *See Flowers, supra;* Ark.Code Ann. § 9–27–317(c). The State contends that there is no authority to support the suggestion that an accused who asks for a further explanation or clarifica-

tion of a *Miranda* right cannot intelligently waive that right. Here, Officer Zeek responded to appellant's question by providing an explanation, which included more detail than appellant acknowledges. The State claims that Officer Zeek explained in response to appellant's question regarding a waiver that it means he is deciding to give a statement of his own free will, that he has not been promised anything or threatened in any way, and that he is making a statement to the police solely because he wanted to.

■ Appellant also argues that the trial court ignored crucial testimony from Dr. Christopher Lamps, who concluded that appellant did not freely, voluntarily, or intelligently waive his rights. The trial court found that Dr. Lamps's testimony was given in generalities that young children would not be able to understand the implications of waiving the right to an attorney. However, appellant argues that the doctor specifically testified that appellant was not able to make a knowing or intelligent decision in this case. Appellant contends that the State did not meet its burden of proof because it did not produce any expert to contradict Dr. Lamps's findings.

■ There is no requirement for the State to produce an expert to contradict the defense expert's findings. A fact-finder is not bound to accept opinion testimony of experts as conclusive, "even when several competent experts concur in their opinions and no opposing expert evidence is offered." *Haynes v. State,* 346 Ark. 388, 396, 58 S.W.3d 336, 342 (2001) (quoting *Davasher v. State,* 308 Ark. 154, 823 S.W.2d 863 (1992)). Therefore, the trial court was free to reject Dr. Lamps's testimony, regardless of whether contradictory testimony was presented.

Appellant claims that the trial court also erred in rejecting his argument that a parent with an adverse interest should not be allowed to consent to a juvenile's waiver of rights. He admits that Arkansas Code Annotated section 9–27–317(c) does not mention adverse interests; however, he argues that the mother's adverse interest should have been considered and the waiver rejected on that basis alone. *See* Ark. Code Ann. § 9–27–317(d) and (g) (where no waiver of right to counsel shall be accepted in a case when a parent causes a FINS petition to be filed and when a child is in DHS custody).

■ Arkansas Code Annotated section 9–27–317 does not provide that a parent with an adverse interest should not be allowed to consent. Moreover, although the officers obtained the mother's consent before speaking to appellant, they were not required to do so, and, accordingly, whether she had interests adverse to appellant at the time she consented is of no consequence. Given the totality of the circumstances, the trial court did not err by finding that appellant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

### B. *Confession/Coercion*

■ Appellant argues that his confession was coerced, and therefore, not voluntarily, knowingly, and intelligently given. He claims that he was subject to influence by the police. Further, that Dr. Lamps testified that the actions and words of the police constituted coercion. He argues that his request to leave after his confession indicates an off-camera promise that a confession would end his all-day and night ordeal. *See Pyles v. State,* 329 Ark. 73, 947 S.W.2d 754 (1997) (where our supreme court held that officer's statement to defendant that he would "do everything in the world [he] could for" him was false

promise that resulted in involuntary confession).

As noted above, the trial court was free to reject Dr. Lamps's opinion on this or any issue. *See Haynes, supra.* The trial court listened to the testimony and viewed the same taped statements upon which Dr. Lamps based his opinions and concluded that the confession was not the result of any threats or inducements, but was given of appellant's own free will with knowledge of the circumstances. Further, coercion cannot be presumed because what was said to appellant between 6:45 p.m. and 10:20 p.m. was not recorded. There was no evidence that appellant was made any promises or subjected to any threats or coercion during this time. However, the State presented the testimony of the officers who were with appellant, each of whom testified that no threats or promises were made to appellant during the time in question. The trial court found the officers' testimony, along with the prosecuting attorney's testimony, credible. Finally, appellant does not point to a single statement by any officer for the proposition that he was promised that he could go home if he confessed. Appellant asks this court to assume that a promise was made. However, this assumption flies in the face of the evidence, which included specific and unequivocal denials by all officers that appellant was promised anything. Accordingly, we affirm.

C. *Ark.Code Ann. § 9–27–317(i)(1)(C)*
*(Repl.2008), and Ark. R.Crim. P.*
*2.2(a),(b) (2009), and 2.3 (2009)*

 Whenever a law enforcement officer has reasonable cause to believe that any juvenile found at or near the scene of a felony is a witness to the offense, he or she may stop that juvenile, but the detention should not last more than fifteen minutes. Ark.Code Ann. § 9–27–317(i)(1)(C).

Appellant argues that it was egregious for the police to detain him as long as they did. He claims that he was not allowed to leave the interview room to get a drink and he was not taken to his grandparents so they could take him to dinner. He argues that there was nothing to indicate that he was free to leave. Therefore, the actions of the police indicated that he was detained. *See Moore v. State,* 285 Ark. 321, 686 S.W.2d 790 (1985). Appellant argues that this detention was illegal and his confession should have been suppressed. *See Brown, supra;* and *Wong Sun, supra.*

The State argues that the statute is inapplicable because appellant was never detained "at or near the crime scene." Ark.Code Ann. § 9–27–317(i)(1)(C). We agree. Appellant remained with his mother in a relative's car while officers investigated the crime scene and subsequently went to the station voluntarily. Appellant argues that once at the station, he was not permitted to leave. However, this contention is not supported by the evidence, which shows that he remained in the break room with his family before officers spoke with him, that officers sought and obtained permission from his mother prior to speaking with him, that appellant was not prevented from leaving, and that he was not handcuffed or otherwise restrained at the station prior to the time he implicated himself in the crime. The State also points out that the statute does not contain a requirement that police tell someone in appellant's position that he was free to leave the station.

Arkansas Rule of Criminal Procedure 2.2 (2009) states:

(a) A law enforcement officer may request any person to furnish information or otherwise cooperate in the investigation or prevention of crime. The officer may request the person to respond to questions, to appear at a police station,

or to comply with any other reasonable request.

(b) In making a request pursuant to this rule, no law enforcement officer shall indicate that a person is legally obligated to furnish information or to otherwise cooperate if no such legal obligation exists. Compliance with the request for information or other cooperation hereunder shall not be regarded as involuntary or coerced solely on the ground that such a request was made by a law enforcement officer.

Ark. R.Crim. P. 2.2(a) and (b). Appellant contends that the State did not offer any evidence of compliance with this rule.

Rule 2.3 states:

If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

Ark. R.Crim. P. 2.3 (2009). Appellant argues that this rule was violated in that the police failed to take any steps that would have made it clear to him that he was free to leave. They would not let him get up to get a drink or go to dinner with his grandparents. He was questioned for almost fifty minutes before they read him his rights. He argues that police are required to tell a person of the right to refuse a request to search a residence. *See State v. Brown*, 356 Ark. 460, 156 S.W.3d 722 (2004). Likewise, appellant contends that police should be required to tell a child of the right to leave after the permissible fifteen-minute detention.

However, neither rule requires an explicit statement by officers that a person is not required to furnish information, cooperate, or accompany the police. *E.g., Wilson v. State*, 364 Ark. 550, 222 S.W.3d 171 (2006). The question of whether a person's consent to furnish information or to accompany police to the station is voluntary or the product of duress or coercion is to be determined by viewing the totality of the circumstances. *Id.* Here, officers asked appellant and his mother to go to the station to provide information related to their investigation of appellant's sister's death. There is no evidence that any officer indicated to appellant that he was obligated to do so, and he points to none. There is no evidence that appellant requested to go to dinner with his grandparents or in any way objected to being provided with dinner at the station. He was not prevented from getting a drink, but was provided a drink when he indicated he was thirsty. Therefore, the trial court did not err in finding no violation of the statute or rules.

### III. Confession—Reliability and Credibility

Appellant argues that his confession was neither reliable nor credible and the trial court erred in admitting and relying on it. Dr. Craig Adams, the medical examiner (ME), testified that liver mortis (lividity) is the process of blood moving because of gravity after death. He testified that the process usually ends within six to eight hours after death. Appellant first stated that his mother went to bed at 2:30 a.m. and that he went to his sister's room ten to fifteen minutes later. He then said he placed the bags over his sister's head at 3:35 a.m. He did not say that he rolled her. Thus, he contends that she was on her stomach when she died and was not moved until after 11:45 a.m., when her body was discovered. He argues that if she died at 3:35 a.m., lividity would have been fixed by 11:45 a.m. However, the ME testified that he found lividity on the front and back of the child. Therefore, lividity was not fixed

by 11:45 a.m., and the evidence showed that her death would have been sometime after 3:35 a.m. Appellant asserts that because marked lividity occurred after she was discovered and rolled over at 11:45 a.m., her death would have had to occur after 6:00 a.m. Therefore, appellant contends that the trial court erred in admitting and relying on the confession.

During his confession, appellant told police that he went back to his sister's room and loosened "it," referring to the bag. He points out that he did not refer to "them," or "bags." The ME testified that there were no marks on the victim's neck, which would have been present if the bags had been held tight around the victim's neck.

Appellant further claims that the ME testified that there would have been a little bleeding from the multiple lacerations on the victim's upper and lower lips. Yet there was not a drop of blood on either of the bags. He points out that the only blood found was on the pillow case, which is where the victim's face would have been if her head had been held to the pillow. Appellant asserts that the ME testified to fresh bruises on the victim's head, which could have been caused by taps with a hammer. Evidence of a hammer found in the mother's bedroom was introduced at trial. Finally, the ME testified that the child's death was consistent with a 286–pound person straddling the child and holding her face into a pillow. Appellant's mother weighed about 286 pounds at the time of his sister's death.

Appellant claims that the State requested his DNA for purposes of proving he tied up his sister. However, his DNA was not found on the seamstress tape used to tie the victim. Rather, the DNA of an unknown male was found on the measuring tape. Appellant contends that, because appellant was twelve years old, he would have mentioned that the victim wet herself when she died. Appellant contends that had the bags actually been over his sister's head as his confession states, then they would not have been easily removed. Further, that when she was found, the victim's body was in rigor; thus, her head could not have moved without the movement of the rest of her body. Also, that the bags were found on the floor to the child's left. The mother claimed to have quickly removed the bags from the victim's head and placed them on the floor to her left. Appellant contends that because the mother is right handed, the mother's claim is false.

Appellant claims that throughout his confession, he interchanged the use of "bag" and "bags." However, the police focused on his occasional use of the word bags to reach their conclusion that he murdered his sister. He argues that the bags had two holes, not just one as he testified to. Further, appellant contends that the only Walmart bags found in the home after the murder were in the mother's bedroom.

The trial court stated that because appellant did not adopt the police's suggestions of how the murder occurred, his confession was reliable. Appellant argues, therefore, that the trial court discounted the physical and circumstantial evidence and erroneously concluded that the confession was admissible and true. He claims that the trial court ignored that during the three hours of off-camera interview, no one knows the complete details of what was said because the police chose not to record their interrogation. Appellant was reminded by police during the second taped interview to talk about the sleeping pills. Appellant then added to his confession that his sister had taken her sleeping pills. However, the ME testified that none of the many drugs prescribed for the child were in her system. Appellant urges this court

to conclude that the confession was not reliable.

He contends that because he could never tell the police where the wallet was located and had no knowledge of missing money, his confession was not reliable. He points out again that the information told to appellant during the three-plus hours of interrogation is not known. He never admitted to throwing the wallet outside, and if he had done so, it is illogical to conclude that he would not remember doing it. However, the mother did tell police about how she did not know how to operate the alarm on the back door, that appellant always did that. The mother also told police that $147 was in the wallet. Appellant claims that the trial court ignored evidence about the mother's bipolar diagnosis and her failure to take medication for the five months previous to the murder.

The issue of the statement's reliability is a question for the fact-finder at trial and not for the trial court at a suppression hearing as it goes only to the weight, and not the admissibility, of the evidence. *E.g., State v. Sheppard*, 337 Ark. 1, 987 S.W.2d 677 (1999). Therefore, appellant's claim that the trial court erred in admitting his confession due to its purported unreliability must fail, regardless of whether the alleged inconsistencies exist. Further, appellant's contention that the trial court erred by relying on the confession, pointing to what he contends are inconsistencies between the confession and some of the evidence is also without merit. Once determined to be admissible, the weight to be accorded a confession is an issue for the trier of fact. *See Smith v. State*, 314 Ark. 448, 863 S.W.2d 563 (1993). The issue of whether the confession was credible was for the trial judge, and substantial evidence supports his determination. As such, appellant's reliability challenge should be rejected.

## IV. *Brady Violation*

Appellant contends that, at trial, police officers testified that Chico Spink came drunk to the police station rambling about appellant's mother talking in her sleep, saying that she had killed appellant's sister. Appellant points out that Captain Demoyne Gray testified that the police interview with Spink had been recorded and no attempt was made to have the tape enhanced. Defense requested a dismissal of the charge against appellant because defense had requested all exculpatory evidence, and the taped interview was never provided to defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), sets forth the three elements of a *Brady* violation:

1. Evidence is favorable to the accused, either because it is exculpatory or impeaching;

2. Evidence was suppressed by the State, either wilfully or inadvertently; and

3. Prejudice ensued.

*Id.* at 279, 119 S.Ct. 1936. Appellant contends that suppressing the recorded testimony of a witness who named another person as the killer is the epitome of a *Brady* violation. Appellant asserts that, here, not only was the evidence exculpatory, but it was also impeaching of both the police and the mother. He maintains that failure to disclose this information seriously prejudiced his case. Appellant contends that even though the defense had been furnished the name of the witness, without the recording, the witness could not have proved he was sober. Further, the recording of a sober-sounding witness could have been used to impeach the credibility

of the officers' testimony and memories of the interview, as well as the testimony of the mother. Appellant speculates about the reason for the State not furnishing the videotaped interview of Spink, concluding that the State's failure to provide the tape is especially egregious since it was common practice for the police to record statements.

The evidence before the court showed that, during the investigation, a man named Chico Spink came to the police station, claiming to be the boyfriend of appellant's mother. He alleged that the mother sat up in bed and, using two or three different voices and personas, talked in her sleep about details of the victim's death. The ME testified that he made notations of a telephone call he subsequently received from Captain Gray in which Gray indicated that the mother's new boyfriend "said she talked in her sleep giving details of the death and she may have more to do with it" than appellant. The officers present when Spink was at the station testified that he was highly intoxicated, was asked to return later, and that, when he returned, he was still drunk. When asked if a recording was made of the conversation with Mr. Spink, several officers stated that they did not know, and Captain Gray testified that he "believed" there was a recording but that he had never listened to it. The State provided appellant with both Mr. Spink's name and the substance of his statement to police.

Appellant contends that the trial court should have granted his motion to dismiss because he was not provided with a recording of Mr. Spink's statement. However, the State argues, and we agree, that appellant did not establish conclusively that the alleged *Brady* evidence even exists. Appellant claims that Gray "admitted" that a recording had been made. The record, however, indicates that Gray testified only that he "believed" a recording was made but that he had never listened to it. The only information the State undisputedly had with respect to Mr. Spink is his name and the substance of his statement to police, both of which were provided to appellant.

Appellant claims that Mr. Spink told police that he heard the mother "say that she had killed appellant's sister." However, the testimony at trial was that an intoxicated Mr. Spink told police that the mother sat up in bed and, using two or three different voices and personas, talked in her sleep about details of the death. This statement neither inculpates the mother nor exonerates appellant.

Appellant was provided both the name and the substance of Mr. Spink's statement. Appellant chose not to speak with him or call him to testify. In the absence of his testimony at trial, any statements, exculpatory or otherwise, that may be gleaned from a tape recording of his conversation with police would constitute hearsay. Nor could the tape have been used for impeachment, as Mr. Spink did not testify. Accordingly, we affirm the trial court's ruling.

### V. *Ark.Code Ann. § 9–27–330 (Supp.2007)*

Appellant contends that Arkansas Code Annotated section 9–27–330 [2]

---

2. Arkansas Code Annotated section 9–27–330 states in pertinent part:
 (a) If a juvenile is found to be delinquent, the circuit court may enter an order making any of the following dispositions based upon the best interest of the juvenile:

 . . .

 (4)(A) Place the juvenile on probation under those conditions and limitations that the court may prescribe pursuant to § 9–27–339(a).
 Ark.Code Ann. § 9–27–330(a)(4)(A).

does not authorize a court to place a child on probation for a period of more than two years. Therefore, appellant claims that the trial court erred in placing him on probation until his eighteenth birthday. Further, he claims that the trial court erred in committing him to DYS. He argues that the trial court failed to consider other alternatives, his best interest, and the least restrictive alternative, as required by statute. Because all the testimony by the grandparents, teachers, and best friend's mother was that appellant was obedient, compliant, and well mannered, appellant argues that he does not belong in the DYS facility.

First, the State argues that appellant failed to object to the disposition based on this argument at the trial court level. After the trial court made its announcement, appellant assured the trial court that there were no further matters to be addressed and the hearing was concluded. Because an argument may not be raised for the first time on appeal, appellant's objection is waived and should not be addressed. *Jones v. State,* 347 Ark. 409, 64 S.W.3d 728 (2002).

Nevertheless, appellant's argument must fail because the trial court did not place appellant on probation until his eighteenth birthday. Rather, it sentenced him to an indeterminate term at DYS and ordered that, should he be released prior to his eighteenth birthday, he would be placed on probation at that time until he turned eighteen. Appellant fails to point to anything within the statute that limits a period of probation to two years. Finally,

appellant's argument that he had no prior record or history of behavioral problems and that the trial court failed to consider the least restrictive alternative must fail as there is no law cited. Here, the trial court's ruling demonstrates that it considered appellant's best interests as required pursuant to section 9–27–330. Moreover, the trial court's decision is consistent with the recommendations of a counselor with the South Arkansas Youth Services who assessed appellant and recommended a DYS commitment. We hold that the trial court committed no error in the disposition.

## VI. *Appellant's Silence*

Appellant claims that he has an absolute right to remain silent under the Fifth Amendment to the United States Constitution, made applicable to this state by the Fourteenth Amendment. However, at the conclusion of the suppression hearing, the trial court commented that appellant had not taken the stand. Appellant contends that the trial court ignored the fact that appellant's version of what occurred off-camera was already in the record in the form of the statement he had made to Dr. Lamps. Appellant also claims that the prosecutor improperly argued about appellant's silence during the trial. Therefore, he asserts that his request that charges be dismissed for violating his right to remain silent should have been granted.

The State argues that the record shows that the trial court in its ruling from the bench observed that the State had

Arkansas Code Annotated section 9–27–339(a) (Repl.2008), states as follows:
(a)(1) After an adjudication of delinquency, the court may place a juvenile on probation. The conditions of probation shall be given to the juvenile in writing and shall be explained to him or her and to his or her parent, guardian, or custodian by the pro-

bation officer in the initial conference following the disposition hearing.
(2) The court shall notify the Division of Youth Services in its commitment order of the order of probation including the juvenile's compliance with the division's aftercare plan, if provided in the treatment plan.
Ark.Code Ann. § 9–27–339(a)(1)–(2).

presented evidence that appellant was free to leave the police station and that his statements were not coerced or otherwise involuntary, and noted that this evidence was not disputed by any direct testimony from appellant. First, the State argues that appellant's objection came too late. Because it was not made at the first opportunity and contemporaneously with the alleged error, the objection is not preserved for appeal. *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997). The trial judge's comment was made on October 29, 2007, when he denied appellant's motion to suppress from the bench. Appellant did not object until, five months later, he filed a motion to dismiss on April 2, 2008.

|₃|Assuming appellant's argument is not barred, his argument is without merit because when a defendant testifies in support of a motion to suppress evidence, his testimony may not be admitted against him in trial. *Sims v. State*, 258 Ark. 940, 530 S.W.2d 182 (1975). Accordingly, the trial court's observations were neither incorrect nor improper, as appellant could have testified at the hearing without fear of incriminating himself or otherwise waiving his right against self-incrimination. Further, the trial court explained his statements when he denied the motion to dismiss. He reasoned that there was nothing in the record other than the State's evidence regarding what occurred during the hours between 6:45 p.m. and 10:20 p.m. on the evening in question. We hold, therefore, that no error was made.

Affirmed.

GLOVER and HENRY, JJ., agree.